[No. 12753. Department One. October 17, 1916.]

# T. F. Peterman, as Peterman Manufacturing Company, Respondent, v. Anna Maria Goss et al., Appellants.[1]

CONTRACTS—BUILDING CONTRACTS—PROVISION FOR ARBITRATION AND NOTICE—"OTHER CONTRACTORS." The disputes of a general contractor with his materialmen and subcontractors are not submitted to the arbitration of the architects by a contract for the construction of a school building reciting that the heating, plumbing, electric work, painting and general excavation will be let in separate contracts and not included in the general contract, and providing that the general contractors shall allow space to contractors for parts of the work not included in the general contract and that the contractors are to work in harmony and their differences settled by the architects, where the clause in question provided that, should any contractor or subcontractor claim damages on account of the delay or negligence of other contractors, he must give written notice of the claim to the architects for adjustment etc.; since the same has application only to "other contractors" "not included in the general contract," and hence does not require notice of claim for damages by the general contractor on account of the delay of a subcontractor furnishing him mill work on the general contract.

SAME — PERFORMANCE OR BREACH — DELAY — DAMAGES — OFFSET— OVERHEAD CHARGES. In a subcontractor's action against a contractor, overhead charges for salaries during the period of delay through plaintiff's failure to perform on time will not be allowed as a set-off, where it appears that the general contractor's other work was not finished during that time and that the overhead charges would have been continued and incurred in any event.

SAME—PERFORMANCE OR BREACH—DELAY—DAMAGES — EVIDENCE — SUFFICIENCY. The conclusion of witnesses that there was a twenty-five per cent loss in efficiency in installing mill work in a school building through delay in furnishing the mill work is not warranted by the fact that ten to fifteen carpenters were laid off at various times by reason of the delay, it appearing that the contractor was not put to the expense of carrying the carpenters when laid off.

SAME—PERFORMANCE OR BREACH—DAMAGES—OFFSET. The cost of handling and refinishing defective mill work rejected by the inspectors, is a proper element of damages to be offset against the claim of a subcontractor furnishing the mill work.

[1]Reported in 160 Pac. 432.

SAME—PERFORMANCE OR BREACH — DELAY — DAMAGES — INTEREST. Interest on money borrowed by a contractor during the time his work was held up by the delay of a subcontractor is a proper element of damages to be offset against the subcontractor's claim.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered October 22, 1914, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Reversed.

*Fogg & Fogg,* for appellants.
*John E. Gallagher,* for respondent.

PER CURIAM.—Tacoma School District No. 10, on September 9, 1912, let to F. H. Goss the general contract for the construction of the Central School building, in the city of Tacoma. This contract required the building to be completed by July 15, 1913. The contracts for excavation, heating, plumbing, electric work and painting were let to other contractors. Goss' contract contained the following provisions:

"(1) *Contractor.* The contractor is to provide all materials and labor necessary for the complete and substantial execution of everything described, shown or reasonably implied in the drawings and specifications for his part of the work, including all transportation, scaffolding, apparatus and tools necessary for the same. All materials shall be the best of their respective kind, and all workmanship shall be of the best quality.

"(2) *Other Contractors.* The general contractor shall allow the contractors for parts of the work not included in his contract proper room for the storage of their materials and the execution of their work. The contractors shall work in harmony. The architects and superintendent will settle all differences arising, and their advice and orders shall be binding and final. Each contractor is to carefully read all of the specifications, so as to better understand his part of the work. The contractors are to carry on their work at all times with the greatest reasonable rapidity under the direction and to the satisfaction of the architects, superintendent and owner.

"(3) *Interpretation of Drawings.* In the event of any doubt or question arising respecting the true meaning of the drawings or specifications, reference shall be made to the architects, whose decision shall be final and conclusive.

"(4) *Damages Claimed for Delays by Other Contractors.* Should any contractor or subcontractor claim damages on account of the delay, negligence or carelessness of other contractors, or for any other cause, he must declare the amount of such damages and make claim for same in writing at the time the damage is incurred. He shall deliver such written claim to the architects or superintendent and to the party at fault, within 48 hours of the occurrence, that such claim may be adjusted by the architects or superintendent. Failure to act as provided above will render such claim null and void.

"(5) The heating, plumbing, electric work, painting and general excavation will be let in separate contracts, and are not included in the general contract."

On November 4, 1912, Goss entered into a subcontract with the Peterman Manufacturing Company to supply the necessary mill work for the building. This contract was as follows:

"Contract for Millwork for Central School.
"Tacoma, Washington, Nov. 4th, 1912.

"We propose to furnish you all the mill work to be used in the construction of the new Central school building situated on South G street between South 7th and South 8th, in the city of Tacoma, according to plans, specifications and details prepared by the architects, Heath & Gove, for the sum of eight thousand seven hundred dollars ($8,700), delivered to the building site.

"Delivery.

"We agree to keep in touch with the contractor of this building and furnish said mill work when needed and in such a manner so as not to detain the progress of the building.

"Terms.

"Eighty per cent to be paid upon delivery of material, on or before the 10th of each month for all material delivered during the preceding month, and the remaining 20 per cent to be paid when building is completed and mill work accepted by architects. (Said 80 per cent to be paid upon approval of mill work by the architects.)

"We agree to make good any defects in material or workmanship for a period of six months after final acceptance by the architects as required by the specifications.

"It is further understood that we have read all the general conditions of the architects' specifications, and the specifications connected with our portion of the work, and this bid and agreement is made in accordance therewith."

The subcontractor began furnishing mill work on December 5, 1912, and continued to do so until November 8, 1913. The building was ready for the interior finish on April 30, 1913, and the subcontractor began supplying material therefor on May 1, 1913. From this date until September 11, 1913, constant protests were made by the contractor against the delay in furnishing mill work. On February 10, 1913, the Peterman Company was paid $938 on account, and on June 28, 1913, was paid $2,000 on a bill rendered for $4,000. F. H. Goss having died, his widow was appointed executrix and proceeded with the contract. On her refusal to pay the balance of the contract price in the sum of $5,762, together with a claim of $721 for extras, the Peterman Manufacturing Company brought suit for $6,483 against the executrix and the sureties upon the contractor's bond. The defendants set up a counterclaim for damages in the sum of $549.83 for material the plaintiff had neglected to supply and which was procured at the contractor's expense; $913 for expense of handling and refinishing defective mill work; $1,120 for overhead expenses for seventy days' delay; $1,412.50 for twenty-five per cent loss in erection efficiency and expense, due to delay on the part of the subcontractor; and $122.50 for interest paid on money borrowed by reason of the plaintiff's delay. The action was tried by the court, which reduced plaintiff's claim for extras to $389.50, and reduced defendants' set-off for plaintiff's failure to furnish items called for by the contract to $440.83. The balance of plaintiff's contract price was allowed in full, and judgment given for plaintiff in the sum of $5,710.67. The defendants appeal.

The only question involved on this appeal is the right of appellants to set off the items of $913, $1,120, $1,412.50, and $122.50, set out above.

In its memorandum decision the trial court recited that,

"Defendant claims items amounting to $913 for working over imperfect mill work. The court finds that defendant is not entitled to credit for these. No notice of any such claim was given at the time as required by specifications on page 7."

"Defendant claims that they were damaged by delay on the part of plaintiff in furnishing materials. Items amounting to $2,654.50. The court finds that plaintiff did occasion considerable delay by not furnishing the mill work as required. However, defendants never gave notice of their claim in this respect as required by the specifications on page 7."

The provision referred to by the court as being on page seven of the specifications is the paragraph numbered (4) which we have quoted from the contract.

Construing the different sections of the specifications together, we think it is plain that the term "other contractors," as used in this section, does not have reference to the subcontractors or materialmen under the general contractor. There were several other contracts on this building "not included in the general contract," such as those for putting in the heating plant, plumbing, electric work, painting and the general excavation. One provision of the specifications is to the effect that "the general contractor shall allow the contractors for parts of the work not included in his contract proper room for the storage of their materials and the execution of their work." Among several contractors on different parts of the work, it is but natural that some conflicts may arise, and with that in view, it was provided that any claims for damages on account of the delay or negligence of any of them must be promptly referred to the architects or superintendent for the purpose of adjustment. Controversies between any of these contractors and their materialmen or laborers were subsidiary matters for which no arbitration was provided in the specifications. If the troubles of any of the contractors

with their own materialmen should occasion delay in the work of the other contractors, the offending contractor could be brought to book by the arbitrators, but there is nothing in the specifications to indicate an intent that the arbitrators should go beyond the contractors themselves to settle disputes which they might have with materialmen who were in no sense parties to the contracts with the school district. The school district would have no right of action against the material-men or subcontractors of a contractor. If the contracting parties had intended to refer these subsidiary disputes to the arbitration of the school district's representatives, the specifications should have so declared in express terms and not left the matter to be implied from the chance signification of some term employed. That this was the interpretation of the architect is shown by the fact that he refused to interfere between appellants and respondent, or, as he testified, "between the general contractor and his subcontractors."

We think the trial court was in error in applying this paragraph of the specifications to the subject-matter of the dispute between appellants and respondent. Since it is without application, it was not necessary for appellants to present any written claim declaring the amount of their damages to the architects or superintendent or to the respondent, within forty-eight hours of the occurrence, or at all.

The relations of the appellants and respondent not being governed by the foregoing section of the specifications, it remains to inquire whether appellants' counterclaim is substantiated by the evidence. The appellants make no claim for the $109.83 worth of material furnished by them and rejected by the court as not properly chargeable against respondent. As to the item of $913, charged against respondent for the expense of culling, loading and unloading lumber and of labor in resanding and finishing imperfect mill work, the evidence of appellants stands without contradiction that the inspectors for the school district refused a quantity of material furnished by respondent because of lack of finish;

that respondent refused to take most of it back; that appellants were compelled to have it sanded by hand instead of machine sanded, as the specifications required; and that, from the actual time-book kept on that work, the expense of resanding was $700, of culling the lumber, $150, and of loading and unloading culled lumber, $63. We think that appellants are entitled to offset the expense of handling and refinishing defective material in these sums, which aggregate $913.

As to the items of $1,120 for overhead expense, twenty-five per cent loss in erection efficiency amounting to $1,412.50, and interest in the sum of $122.50 which appellants were required to pay on borrowed money, the evidence is not so satisfactory. While it clearly shows wrongful delay on the respondent's part, the determination of the amount of damages to be allowed therefor presents the difficulty. The item of $1,120 for overhead charges is made up from the salaries paid the superintendent, manager and general bookkeeper of appellants from July 16 to September 24, 1913, inclusive, the latter being the day on which the building was accepted by the school district. The evidence shows that the brick work was not completed on July 16th, and that the plastering was not fully completed until sometime in November. These were matters requiring the continuance of those general employees in the discharge of their duties, irrespective of the delay in furnishing the mill work, and we do not think it was clearly proved that their continued employment was due to the delay of respondent. The latest complaint of delay in furnishing materials is dated July 19, 1913, with the exception of one on September 11, 1913, concerning glass to be put in the tower, which respondent refused to supply on the theory it was not within his contract. We hold that the item of overhead charges is not a proper subject of set-off against respondent's claim.

The item of $1,412.50, constituting twenty-five per cent of loss in erection efficiency, is claimed as excess of cost of in-

stalling the finish, due to the necessity of shifting carpenters from one piece of work to another because of the lack of material for finishing off one room before proceeding to another. The only evidence as to this was the testimony of the Teeters, father and son, who occupied the positions, respectively, of superintendent and carpenter foreman, and seems to have been more in the nature of conclusions of the witnesses. The foreman testified that carpenters were laid off when there was no work, from ten to fifteen being laid off three or four times. The bookkeeper also testified that as many as ten carpenters were laid off at a time, and that carpenters were discharged half a dozen times. The superintendent testified that he could have worked twenty-five carpenters at a time if he had had the material, but that on account of delay in receiving it, he worked but six carpenters. It appears from this evidence that appellants were not put to the expense of carrying the carpenters when there was no work. There was doubtless some loss in the efficiency of the force from being shifted back and forth between the rooms because of the lack of material. But there is no satisfactory evidence as to the amount of such loss. The conclusions of the witnesses are certainly high when they declare that it was one-fourth of the expense of installing the finish. The school district waived its demurrage claim of $100 per day against the contractor, necessitating the exclusion of that item from consideration.

Respecting the counterclaim of $122.50 for interest, H. F. Goss testified that it was necessary to borrow money to carry on the work, because his estimates were held up by reason of lack of mill work for the building; that he borrowed $5,000 on July 26, 1913, and $4,000 on August 13, 1913, on which interest was paid in the total amount of $122.50. This evidence is direct and positive and was not contradicted. The evidence further shows that the last estimate allowed and paid prior to final acceptance of the building was on July 4, 1913. The necessity for borrowing this money was due to delay in getting mill work for the interior finish. The con-

tract provided for payment of estimates every two weeks, and the failure to make any estimates between July 4 and September 24, 1913, was due to inability to finish up the interior on account of lack of mill work. We think this interest was a proper element of damage and should have been allowed to appellants.

The judgment will be reversed, with instructions to reduce the judgment in favor of respondent by deducting therefrom the items of $913 and $122.50, totaling $1,035.50. The appellants will recover costs of appeal.