[No. 15669.   Department Two.   November 1, 1920.]

CAHALAN INVESTMENT COMPANY *et al.*, *Respondents*, v.
YAKIMA CENTRAL HEATING COMPANY, *Appellant*.[1]

SPECIFIC PERFORMANCE (51)—EXISTENCE OF CONTRACT—WEIGHT AND SUFFICIENCY OF EVIDENCE. A contract to furnish heat for an apartment house will not be specifically enforced where there is a conflict in the evidence as to whether the contract was entered into and its existence is not shown by clear and convincing evidence.

SAME (11)—CONTRACTS ENFORCIBLE—DURATION OF—SUPERVISION OF COURT. A decree of specific performance of a contract to furnish heat for an apartment house will not be entered where it would involve a supervision of the matter for a term of years, only private interests are involved, and it appears that the plaintiff has an adequate remedy at law.

SAME (1)—REMEDY IN DAMAGES. The difficulty in proving damages for breach of a contract to furnish heat for an apartment house does not show that there is no adequate remedy at law, so as to authorize an action for specific performance.

DAMAGES (66)—BREACH OF CONTRACT—MEASURE OF DAMAGES. The measure of damages for breach of a contract to furnish heat for an apartment house is the difference between the agreed price and the price plaintiff will be compelled to pay to procure a like service.

Appeal from a judgment of the superior court for Yakima county, Holden, J., entered June 2, 1919, in favor of the plaintiffs, in an action for specific performance, tried to the court. Reversed.

*Rigg & Venables*, for appellant.

*Preble, McAuley & Meigs*, for respondents.

[1]Reported in 193 Pac. 210.

FULLERTON, J.—This is an appeal from a decree of the superior court of Yakima county, awarding to the respondent, Cahalan Investment Company, a mandatory injunction, requiring the appellant, Yakima Central Heating Company, to furnish steam heat for an apartment building owned by the respondent, in accordance with the conditions of a contract which the court found had been entered into between the parties. The facts appearing from the record are, in substance these:

In the year 1917, the appellant was, and for a number of years prior thereto had been, engaged in the business of furnishing steam heat to buildings in the business district of the city of Yakima. It owned a steam heating plant, consisting of boilers and other equipment, and owned the conduits leading from the plant to the places of use, but did not itself generate the steam heat it used. This was generated by another corporation under a contract at certain fixed rates, which contract, at the time named, had a number of years to run. The respondent was then contemplating the erection of an apartment building in the city of Yakima. Learning of this, the appellant made it a proposition to furnish the building with steam heat. The proposition was in the form of a letter; the parts thereof material to the present controversy being as follows:

"Referring to the matter of service for your proposed apartment building to be located at 4th St. & Yakima Ave., North Yakima, Washington.

"We propose to supply steam for the heating of said building and for heating water for an eight-month season at $1,500 per season, on a five-year contract, providing that the system shall be installed according to the plans and specifications drawn by us; same to be so designed that it may be converted into a private

plant at the end of the five year period, if desired. The eight-month season mentioned shall be from September 15th to May 15th.

"These figures are based upon your installing your water system with a pre-heater in such a manner that all condensation from the radiators will pass through it. The tank containing the hot water to be equipped with an Ideal Syphon Tank Regulator, or other type of tank regulator approved by us. Said regulator to be connected to the steam main to increase the temperature of the water. This tank is to be properly lagged.

"The figures given are based upon 4,400 feet of radiation installed in the building. If the amount of radiation is greater or less than this amount our figures will be changed by adding or decreasing 30c per foot per season."

There was no acceptance in writing of the proposition; nor was there any written contract entered into between the parties embodying its terms. The respondent, however, proceeded with the construction of the building. It employed a Mr. Bradley to furnish and install the steam pipes and radiators necessary to heat the building, and directed him to consult with the appellant as to the plans and specifications for the heating appliances required. Following these instructions, Mr. Bradley collaborated with the representatives of the appellant, and they together determined upon the necessary installation, drawing outline plans therefor. No formal specifications were drawn, although, seemingly, certain matters which might have been proper in specifications were delineated on the plans. The heating appliances were installed as the building progressed; and during the course of the work it was inspected from time to time by the appellant's representatives. The recommendations of these representatives were not followed implicitly, however, by Mr. Bradley. In certain places piping of a larger size, and in certain others piping of a smaller size, than that

recommended was installed. The plant as installed was so designed as to be readily converted into a private heating plant, and all of the witnesses agree that there was nothing special or unusual in its design, but that it was such a plant as is usually installed in buildings of like character.

After the installation of the plant, the appellant connected its mains therewith and furnished the necessary steam for heat until the close of the heating season of 1918, charging therefor at the rate named in its written proposal. At that time it notified the respondent that it would not continue furnishing heat for the building, except at an increased rate—the current rate paid by other consumers of its product. The respondent thereupon instituted the present action, with the result we have before indicated.

There is a dispute in the evidence on the question whether there was a formal acceptance of the proposal. The manager of the heating plant testified that he verbally accepted the order on his company's behalf in April, 1917. On the other hand, the appellant's representative testified that there was no acceptance of the offer whatsoever. That, on the contrary, sometime late in the summer of 1917, he notified the respondent's manager that his company would be unable to furnish heat in conformity with the proposal for the period specified; that it would do so as long as it could obtain steam from the corporation which was then supplying it at the rate of its existing contract, but if the rates were raised to it, it would be compelled to raise the rates to its consumers correspondingly, and that the respondent assented to this new proposal. He testified further that the flat rate offered was based upon the company's meter rates and was substantially the then prevailing rate charged its consumers generally. There

was further evidence to the effect that the company generating the steam for the appellant later refused to continue in the performance of its contract and refused to generate heat unless there was a readjustment of rates—the reason given being that war conditions had so increased the cost of production that it could not proceed further without bankruptcy.

It is our opinion that the record is insufficient to warrant a decree of specific performance. First; it is a general rule that a decree for the specific performance of a contract will not be granted unless the evidence of the making of the contract is clear and convincing (25 R. C. L. 337, § 160; *Wilbur v. Toothaker*, 105 Me. 490, 75 Atl. 42), and we are not persuaded that the evidence here satisfies the rule. But we think we should refrain from a discussion of the evidence or from expressing the deductions and conclusions we draw therefrom. The conclusion we have reached in the case as a whole leaves open to the respondent the right to maintain an action at law as for a breach of the contract, and any discussion of the evidence on our part could well prejudice one or the other of the parties in the trial of such an action. It may be well to say, however, that a distinction exists in the degree of proof required to establish a contract when the action is one to recover in damages for a breach of the contract and when it is one to enforce a specific performance of the contract. In the one case the plaintiff may recover if he shows the existence of the contract by a preponderance of the evidence (provided, of course, his evidence makes a *prima facie* case), while in the other he must satisfy the court of the existence of the contract by clear and convincing evidence.

Second; a court of equity is always loath to specifically enforce a contract the enforcement of which

requires the subsequent supervision and direction of the court, especially so where the contract extends over a considerable period of time. Here the period of time for which this supervision must continue, according to the decree as entered, is three years. Many differences can arise, and most certainly will arise, between the parties during this time over the question whether the contract is being properly performed, to settle which will require investigations and orders on the part of the court, and it can involve the taking by the court of complete control of the appellant's business through the instrumentality of a receiver. To conduct a private business is not the function of a court of equity. Where there is a public interest involved, to take control of a business is proper, and is sometimes necessary, even though the act may involve the conduct of the business for a time. But where, as here, only private interests are involved, the court will not assume control of a business, nor enter a decree the enforcement of which may require it to control and conduct the business, unless the complainant is wholly otherwise without remedy.

"A court of equity can decree specific performance only when it can dispose of the matter in controversy by a decree capable of present performance, but it cannot decree a party to perform a continuous duty, extending over a series of years, but will leave the aggrieved party to his remedies at law." *Roquemore & Hall v. Mitchell Bros.*, 167 Ala. 475, 52 South. 423, 140 Am. St. 52.

For an exhaustive note on the question, see 140 Am. St. Rep. 55-89. Third; a court of equity will not ordinarily specifically enforce the performance of a private contract where the aggrieved party has an adequate remedy at law. Here we think there is such an adequate remedy. The respondent can maintain an action

at law in damages for breach of the contract. The argument advanced against this is difficulty of making proofs of the actual loss. But the facts present nothing unusual in this respect. The contract was breached when the appellant refused to perform. There can be but one breach, and the respondent now has the right to recover in a single action all the damages it has suffered or will suffer by reason of the breach. *Oldfield v. Angeles Brewing & Malting Co.*, 77 Wash. 158, 137 Pac. 469. The measure of its damages is the difference between the price at which the appellant agreed to furnish the heat and the price it will be compelled to pay to procure a like service. Seemingly, there could be no insurmountable difficulty in the way of making proofs of this difference.

Our conclusion is that the court erred in decreeing a specific performance of the contract. The decree will therefore be reversed, and the cause remanded with instructions to enter a decree in favor of the appellant to the effect that the respondent take nothing by its action.

HOLCOMB, C. J., MOUNT, TOLMAN, and BRIDGES, JJ., concur.