[No. 19270. Department One. March 4, 1926.]

PENINSULAR SAVINGS & LOAN ASSOCIATION, *Respondent,*
v. C. J. BREIER COMPANY, *Appellant.*[1]

[1] CORPORATIONS (155)—AGENTS—APPARENT AUTHORITY. The general manager of a corporation conducting a merchandizing business has apparent authority to make a lease of a store building which is required for the conduct of the business.

[2] DAMAGES (27)—MITIGATION—CONSEQUENCES AVOIDABLE BY PERSON INJURED. Upon learning that a lessee's agent had no authority to enter into a lease, and that the lease would not be carried out, the landlord is bound to mitigate his damages by making a reasonable effort to put the premises to some other beneficial use.

[3] LANDLORD AND TENANT (116)—ACTION FOR RENT—DAMAGES. In an action on *quantum meruit* for rent under an agent's unauthorized lease and occupancy, the landlord cannot recover rent for the period after learning that the lessee would not carry out the lease, if he could, by reasonable effort, have put the premises to some other beneficial use.

Appeal from a judgment of the superior court for Kitsap county, French, J., entered March 2, 1925, upon

[1]Reported in 243 Pac. 830.

findings in favor of plaintiff, in an action for the recovery of rent, tried to the court. Reversed.

*Rummens & Griffin,* for appellant.
*Marion Garland,* for respondent.

FULLERTON, J.—This is an action by the Peninsular Savings & Loan Association against the C. J. Breier Company to recover in *quantum meruit* for the rental of certain premises situated in the city of Bremerton, in this state. The cause was tried to the court sitting without a jury, and resulted in a judgment in favor of the association for $548. The C. J. Breier Company appeals.

The principal facts of the case are not in serious dispute. The appellant is a corporation organized under the laws of the state of Idaho. It operates a system of stores for the sale of merchandise in the states of Idaho, Washington and Oregon, one of such stores being located at Bremerton. The manner in which the appellant is organized and its method of doing business is stated only generally in the record, but we gather therefrom that it is incorporated for $1,000,000, divided into shares of stock known as common and preferred. When a new store is established, there is assigned to it a certain proportion of the stock, both common and preferred; the preferred stock being held by the stockholders of the general company, and the common stock is divided between the general stockholders and the person who is put in charge of the particular store. In this instance, there were assigned to the Bremerton store 12,600 shares, of which 8,400 were preferred and 4,200 were common. One C. R. Gates was made local manager of the store, and to him were assigned one-third of the shares of the common stock. His compensation was a fixed salary and

such a share in the profits as the common stock would earn from the local business.

The powers of the local manager were restricted. He was given no authority to purchase merchandise, or to pay for merchandise purchased. The buying was done by representatives of the general corporation employed for that purpose, and the bills incurred therefor were paid from the company's general office. Nor does it appear that the local manager had power, as between himself and his principal, to enter into any form of obligation on behalf of the company, even for that department of which he was manager; his powers being confined solely to the sales of merchandise.

For some months prior to the beginning of the year 1924, the managers of the corporation were desirous of making a change in the location of the store at Bremerton. They were occupying a place on which they had a long-time lease, but it was thought another location would be more desirable. To that end Gates began negotiations with the respondent looking to the rental of a building in which the respondent had a leasehold interest. These negotiations finally termi-. nated in an agreement by which Gates, on behalf of the appellant, agreed to sub-lease the premises for a three-year term, at a rental of $150 per month, payable monthly in advance. By the terms of the agreement, certain improvements were to be made in the premises at the cost of the lessors, and a deposit was to be made by the lessees to be credited as rental on the last months of the lease. These negotiations reached their termination on April 17, 1924, at which time the respondent delivered to Gates a key to the premises. Shortly thereafter a formal written lease was prepared by the respondent and forwarded to the head office of the appellant for execution. The appellant,

however, did not execute the lease, and certain of its executive officers came to Bremerton in the latter part of April, or the first of May, to look over the situation. On looking it over, they declined to enter into the lease, and so notified Gates. It appears from their testimony, of which there is no direct contradiction, that they were not informed by Gates how far the negotiations had proceeded and did not then know that Gates had accepted a key to the premises. In so far as the executive officers of the appellant knew, the transaction then ended. It appears, however, that Gates kept the key to the premises until the latter part of July, or the first of August following, before he returned it to the respondent. No actual possession of the premises was taken, no rental was paid in advance, nor was any deposit made. There is no direct evidence as to the time when Gates first informed the respondent that the agreement to lease would not be carried out by the appellant, but there is indirect evidence that it must have been so informed long prior to the time Gates finally surrendered the key. This, we gather from the following circumstance. Immediately after Gates learned that the negotiated lease would not be entered into, he began negotiations looking to a severance of his relations with the appellant. These negotiations continued until the latter part of August, 1924, when a settlement was reached, and Gates parted with his interests. While the negotiations were pending, Gates requested the respondent not to sue the appellant for the rent until after his relations were so severed, and the respondent accommodated him. Not only did it not so sue, but it did not even notify the appellant, until after the settlement had been concluded, that it had a claim against it for rent.

The trial court found from the evidence that the appellant was a tenant at will of the premises between

April 17, 1924, the time when the key was delivered to Gates, until August 7, 1924, when the respondent leased the premises to another tenant; and further found that the reasonable rental value of the premises was $150 per month. It concluded as matter of law that the respondent was entitled to a judgment against the appellant for $548, and, as we have before stated, entered a judgment accordingly.

The trial judge, while saying that he was by no means certain that Gates did not have actual authority to enter into the lease, rested his conclusions on the ground of apparent authority; finding that the respondent did not know of the limitations on his actual authority and could rely upon his apparent authority.

[1] As to the doubt expressed by the trial judge, we think the evidence is clear that Gates, as between himself and his principal, had no authority to enter into a binding contract for a lease. It is inferable from the evidence, that he had been authorized to ascertain on what terms a lease of property suitable for the appellant's purposes could be obtained, but there is no evidence, at least none satisfactory to our minds, that he was ever authorized to bind his principal on a contract of lease. But there is support for the conclusion that he had apparent authority to make such an agreement, and support for the conclusion that the respondent did not know of the limitations on his authority at the time the negotiations were entered upon, nor for a considerable time after its conclusion.

It is a general rule, and the rule in this state, that a corporation may be bound by the contracts or agreements of its agent, if within the apparent scope of the agent's authority, although the contract may be beyond the scope of his actual authority. In *Livieratos v. Commonwealth Security Co.,* 57 Wash. 376, 106 Pac. 1125, we said:

"In this day and age when so large a part of the business of the commercial world is transacted through the agency of corporations, those dealing with them cannot be expected to prove the authority of corporate agents by producing a power of attorney under the corporate seal. They have a right to rely upon the apparent authority of those with whom they deal, and for acts done within the scope of that authority the corporation is bound."

So, in *Brace v. Northern Pac. R. Co.*, 63 Wash. 417, 115 Pac. 841, 38 L. R. A. (N. S.) 1135, we said:

"Corporations necessarily act through authorized agents. The more extensive their business, the greater the number of their agents. Departments are created, in charge of superintendents, with many subordinates through whom the corporation conducts its business and deals with the public. If each and every individual having business with such a corporation must at his peril ascertain and determine the exact scope and limitation of the agent's authority, it is manifest that he could not safely deal with the acknowledged agent, and that the business of the corporation itself would be materially impaired. The public is compelled to rely upon the apparent authority of the conceded agents of such corporations, especially when, as managers or superintendents, they are placed in control of departmental affairs. The average individual would be justified in believing the superintendent of the dining car department of a railway corporation was authorized to contract for menu cards for exclusive use in its dining cars, the superintendent himself assuming to purchase them. The superintendent should know the limitations placed upon his authority, and it is to be presumed he will not exceed them. But a private individual not connected with the corporation could not be aware of such limitations. He would readily sell supplies to such an agent for use in his particular department. If for its own purposes a corporation is compelled to employ an agent with such apparent authority as may mislead the public, it should

be required to secure one who will not act in excess of his actual authority, and thereby deceive others."

See, also, *Kitzmiller v. Pacific Coast & Norway Packing Co.*, 90 Wash. 357, 156 Pac. 17.

It is the rule, also, that where the use of buildings or premises is required for the conduct of the business in which a corporation is engaged, its general manager has apparent authority, whatever may be his actual authority, to enter into a contract of lease for such buildings or premises. 14A C. J. 441.

Applying these rules to the facts of the instant case, it must follow that, since the respondent turned the possession of the premises over to Gates under the contract of lease and stood ready to comply with the terms of the agreement on its part to be performed, it is entitled to recover from the appellant the reasonable rental value of the premises between that time and the time it first learned that the appellant would not enter into the lease. From and after the time it so learned the fact, however, its rights are to be measured by a different standard.

[2] It is the duty of every person, who suffers a wrong at the hands of another, to make a reasonable effort to mitigate his damages; and in this instance it was the duty of the respondent, after it learned that the appellant would not carry out the contract of lease, to make a reasonable effort to put the premises to some other beneficial use. It could not bargain with the appellant's agent to remain quiet, until the agent had settled his own difficulties with his principal, and expect to recover from the appellant the reasonable value of the premises during the time of waiting. Instead of complying with the agent's request in this particular, it should have repudiated the request. It will not do to say that it was not required to act, because it had

not been notified of the repudiation of the agent's claimed authority. When the proposition that it delay action was made by the agent, it knew that the agent had ceased to represent his principal's interests, and knew that the agent was acting in interests of his own, to the detriment of his principal's interests;. and common business honesty dictated that it should not acquiesce therein.

[3] The trial court, therefore, was right in allowing a recovery on behalf of the respondent, but we think that it follows that the recovery allowed was too large. The dates given by the witnesses of the times of the happenings of the several events narrated, are unusually indefinite, but we think it reasonably appears that the respondent learned, as early as the end of May, 1924, that the appellant would not carry out the contract of its agent, and that it was at about that time that the respondent entered into its agreement with the agent to delay action. But, because of the indefiniteness of the dates, we will not peremptorily direct the form of judgment to be entered. If the respondent will, within thirty days after the remittitur goes down from this court, consent in writing to take a judgment for rental at the rate fixed by the court from April 17, 1924, to May 31, 1924, the trial court will enter judgment accordingly. If it does not so consent, it will grant a new trial.

The judgment appealed from is reversed, and the cause is directed to be remanded for further proceedings as above directed.

TOLMAN, C. J., HOLCOMB, and MITCHELL, JJ., concur.