[No. 31032. Department One. March 7, 1950.]

WESTLAND CONSTRUCTION COMPANY, INC., *Respondent and Cross-appellant*, v. CHRIS BERG, INC., *Appellant*.[1]

[1] Reported in 215 P. (2d) 683.

*Ralph B. Potts,* for appellant.

*Peyser, Bailey & Cartano* and *Hugo Oswald, Jr.,* for respondent and cross-appellant.

HAMLEY, J.—This case presents questions relative to a purported contract to plaster ten houses—the existence of such contract, its terms, asserted breach, and measure of damages.

Westland Construction Company, of Seattle, Washington, engages in the business of constructing houses and selling them to individual purchasers. At the time of the transaction here in question, the company (which will be designated Westland) was a partnership consisting of K. H. Vitt, Aubrey Schmidt and W. R. Lommel. The partners have since incorporated and the corporation has succeeded to all of the rights of the partnership.

Early in 1946, Westland began the construction of the ten houses involved in this case. Nine of these were to be built according to a blueprint designated as Plan 85. The other house was to be built according to a blueprint designated as Plan 68. The company desired to engage a contractor to do the plastering. With this in mind, Vitt went to the office of Chris Berg, Inc., and discussed the matter with S. D. Studley, superintendent of the latter company. Chris

Berg, Inc. (which will be designated Berg), was a plastering contractor doing work on many housing projects in Seattle.

The meeting between Vitt and Studley took place early in March, 1946. Vitt took with him the blueprints for the two types of houses, and these were left with Studley. The conversation which they had at this time will be discussed at a later point in this opinion. On March 13, 1946, Berg sent Westland the following letter:

"Dear Sir:

"Our bid for lathing and plastering the main floor of your plan No. 85 is, $505.00. An additional $35.00 is to be added if the Recreation room ceiling is to be plastered.

"For lathing and plastering the main floor of your plan No. 68 our bid is, $575.00.

> Very truly yours,
> CHRIS BERG, INC.
> (Sd.) S. D. STUDLEY
> Superintendent"

On March 19, 1946, Westland sent Berg the following communication on a purchase order form:

"To - - - - Chris Berg, Inc.

"Address - - - - 600 Mercer Street, Seattle, Washington

"Please enter our order for the following:

"Ship to - - - 7015 58th North East When ship - - as required

"Lath and plaster nine (9) homes as per Puget Sound Small Homes Plan No. 85 505.00 each

"Lath and plaster one (1) home as per Puget Sound Small Homes Plan No. 68 575.00

> CONFIRMING ORDER
> Per your letter of March 13th
> By (sd.) K. H. VITT
> Purchasing Agent."

Several of the houses were ready for plastering by June, 1946. Westland made repeated requests that Berg begin the work, but this was not done. Early in August, Berg delivered ten thousand wood laths at the project. All of the houses were ready for plastering by the middle of August. On August 14, 1946, Studley, together with George Piper, estimator and engineer for Berg, went to the project and

examined the houses. They then went to Westland's office and talked with Vitt and Schmidt.

At this time Studley informed the partners that, for various reasons hereinafter discussed, Berg would not do the plastering for the figure mentioned in the letter of March 13th. Studley and Piper then recomputed the cost of plastering, and submitted a new estimate. The revised estimate raised the price for plastering each of the nine Plan 85 houses from $505 to $868. It raised the price for plastering the one Plan 68 house from $575 to $1,148. The work sheets on which the new estimates were based show that the price increase was due partly to an increase in estimated yardage and to the inclusion of some unexplained items. However, the major portion of the increase was due to the fact that, after estimating the total cost of plastering the individual rooms ($460 in the case of the Plan 85 houses), this figure was multiplied by one hundred fifty-five per cent. Thus $253 of the $363 increase for plastering the Plan 85 houses is accounted for by this fifty-five per cent blanket increase.

Studley and Piper testified that the job was refigured at the request of Westland, after it was explained that the work could not be done at the original figure. The witnesses for Berg testified further that, although Vitt and Schmidt indicated that this was a heavy price increase, they agreed to the new figure, told Studley to go ahead, and said that Berg would be sent a written confirmation. Vitt and Schmidt, on the other hand, testified that they had at all times insisted that there was a binding contract at the original figure; that Westland did not request or authorize a recomputation and did not agree to the new figure submitted.

On August 16, 1946, Westland wrote to Berg, advising that the work must begin by August 19, 1946, and proceed at a normal and reasonable rate at the prices quoted on March 13, 1946; otherwise, all Berg's materials were to be removed from the property by August 28, 1946. Berg immediately removed the wood lath from the property. Westland then secured the firm of Steeves & Wilson to do the plastering.

Steeves & Wilson agreed to plaster the Plan 85 houses for $686 apiece, and the Plan 68 house for $909.

Westland later began this action against Berg to recover damages for the failure to perform the alleged contract of March 19, 1946. Recovery was sought on three items of damage: (1) The increased cost of plastering; (2) interest paid on borrowed money and reasonable interest on capital funds contributed by the partners during the delay in construction; and (3) increased general building costs, exclusive of increased cost of plastering and exclusive of interest. Total damages sought, not segregated by items in the complaint, were $8,517. Berg cross-complained for four hundred dollars damages for breach of the alleged supplemental contract of August 14, 1946. This sum represents the claimed cost of delivering and picking up wood lath at the project.

The trial court found that a binding contract had been entered into on March 19, 1946; that defendant had breached the contract by refusal to perform; that plaintiff thereby incurred plastering costs of $1,983 in excess of the contract price; and that plaintiff was required to pay additional interest in the amount of $2,604.41 on borrowed funds, by reason of the delay in completion of construction due to defendant's breach of contract. The effect of the findings and conclusions was to disallow damages claimed by plaintiff representing reasonable interest on capital funds contributed by the partners, and representing increased general building costs exclusive of plastering and interest, and to disallow defendant's cross-complaint for damages. Judgment for plaintiff was accordingly entered in the sum of $4,587.41. Defendant has appealed and plaintiff has cross-appealed.

Appellant's first three assignments of error question the trial court's finding that a valid and binding contract existed and was breached by appellant, and the failure to find that there was a subsequent oral contract to do the plastering at the revised figure.

Appellant first contends that, regardless of whether adequate information was furnished upon which a firm bid

could be based, the letter of March 13, 1946, was not intended as such a bid. Accordingly, it is argued, Westland's purported acceptance did not result in a binding contract. In support of this position, appellant's witnesses testified that it was not Berg's practice in 1946 to make firm bids long in advance of the work. Costs were moving up rapidly in the spring of 1946, and serious material shortages were developing. A shortage in rock lath, due partly to strikes, actually developed, making it necessary to use wood lath on plastering jobs at considerably more expense. Studley testified that Vitt did not seek a firm bid at the time of their initial conference, but only wanted an estimate which could be used in making the necessary showing to the Federal housing administration.

Vitt contradicted Studley as to this latter statement, saying that a firm bid was definitely requested. But the clearest refutation of Studley's testimony is to be found in Berg's letter of March 13, 1946, set out above. This letter uses the language of an offer, as distinguished from a mere estimate. It characterizes the price quoted as "our bid." The word "bid," when used in this connection, means an offer to perform a contract. See Bouvier's Law Dictionary (3rd rev.) 342; 10 C. J. S. 356, Bid.

The letter was apparently understood by Westland as an offer, in response to which written acceptance was made on March 19, 1946. After receiving Westland's acceptance, Berg remained silent, though it then should have known that Westland understood the letter of March 13, 1946, to be an offer to enter into a binding contract on the terms there stated. The facts that Berg did not renounce the contract until August 14th and actually delivered a large number of laths to the project prior to that date, also tend to indicate that a contractual relationship was originally recognized by Berg.

Under all of the circumstances, we think the trial court properly rejected the contention that the letter of March 13, 1946, was not intended as an offer.

Appellant contends further, however, that even though the letter of March 13th be regarded as an offer, no binding contract resulted because the subject matter of the contract was indefinite and uncertain in important respects. It is also asserted that, if there was a binding contract, nonperformance was excused because respondent thereafter demanded that appellant perform work not called for in the contract. These two contentions will be considered together. They involve several items of work, each of which will be separately discussed.

Appellant's bid of March 13, 1946, contains no itemization of the work to be performed. It merely refers to ". . . lathing and plastering the main floor of your plan No. 85 . . . [and] your plan No. 68 · . . ." No written specifications accompanied the plans when they were delivered to Berg. The houses were then only in the excavation stage, so that no information could be gained by inspecting the project. Accordingly, the bid had to be based upon information contained in the blueprints or conveyed orally during the original conversation between Vitt and Studley.

The principal items of work to be considered in connection with the contentions now under consideration have to do with plastering around the windows and doors. Appellant contends that the original bid was made on the understanding that plastering would be flush to wooden window and door casings. When it came time to do the work, however, it was found that the windows were to be revealed, using corner beads or window casing heads and a plaster return. With this method, the casing around the window is eliminated and the plaster is carried to the corners and then into the sash. It was also found that the doors were to be bullnosed, which requires plastering to the casing bead instead of using wood trim. It is undisputed that plastering is considerably more expensive where the windows are to be revealed and the doors bullnosed.

The plans indicate the number and size of the windows and doors, but there is no notation as to whether the windows are to be revealed and the doors bullnosed. Each plan

contains a "window schedule" showing, in one column, the dimensions for "trim set (steel)" windows, and in the other column, the dimensions for "alternate (wood)" windows. Vitt, testifying for Westland, stated that at the first conference he had orally informed Studley that steel windows would be used, and further testified that where such windows are used, plaster returns are almost always called for. Both assertions were denied by Studley. Vitt testified that at the time of the original conference he told Studley that the doors and windows were to have plaster returns. The blueprints are silent as to a number of important matters, such as the type of lath and plaster to be used, and the kind of plaster finish. Vitt stated that all of these matters were discussed, including the door and window returns. Studley denied that any of these matters were discussed at the initial conference.

The trial court apparently accepted Vitt's version of the oral negotiations. While no express finding was made on this precise point, such a finding inheres in the court's general finding that a contract "partly oral and partly in writing" was entered into on March 19, 1946, and was breached by appellant. The findings of the trial court in an action at law are presumed to be correct and, on appeal, will be approved by this court unless, from an examination of the record, we find that they are against the weight of the evidence. *Bresemann v. Hiteshue,* 151 Wash. 187, 275 Pac. 543; *Conradi v. Arnold,* 34 Wn. (2d) 730, 209 P. (2d) 491.

Our examination of the record, as outlined above, fails to reveal any basis on which we can conclude that the court's finding on this point is against the weight of the evidence. In view of the alternate schedule of steel and wood windows set out in the blueprints, and the testimony to the effect that plaster returns are usually used around steel windows, the trial court may well have concluded that Berg was at least placed on notice as to the likelihood that plaster returns would be required. The trial court may also have felt that Berg would not have made a bid for this work without knowing what kind of lath, plaster, plaster finish

and returns would be required. Studley's testimony that there was no oral discussion of these points was accordingly not persuasive. In reaching its conclusion, the trial court could properly give application to the rule that courts will not lightly declare a contract void for lack of certainty, but will rather endeavor to discover the true meaning and intent of the parties and give effect thereto. *Warner v. Channell Chemical Co.*, 121 Wash. 237, 208 Pac. 1104.

We conclude that the trial court did not err in rejecting appellant's contention that the contract was indefinite and uncertain with respect to the kind of door and window returns, and the contention that, in requiring plaster returns, appellant was called upon to perform work not called for in the contract.

Appellant also contends that the plans were indefinite and uncertain in that they did not show that the garage backwall was to be plastered. Plan 68, which was to be used in constructing one house, shows no garage. Vitt testified, however, that he informed Studley that a garage would be attached to the front of this house. Plan 85, which was used in constructing nine houses, plainly shows a garage on the first floor level. There is no notation as to whether this garage backwall was to be plastered. Vitt testified that he told Studley that all walls on the first floor, including the garage backwall, were to be plastered. It was not denied that the city ordinance required such plastering. Studley testified, however, that the requirement that the backwall be plastered first came to his attention at the meeting on August 14, 1946. The trial court accepted respondent's testimony on this matter. We cannot say that the testimony preponderates against the court's finding.

Appellant next asserts that only three closets were originally to be plastered in each of the nine houses constructed under Plan 85, but that the plastering of five closets was actually required. It is acknowledged that Plan 85 shows five closets, but appellant contends that originally two of these were to be cedar-lined. The blueprint contains no notation as to this. Vitt testified that he informed Stud-

ley that all closets were to be plastered. Studley's testimony is not sufficiently definite on the point to sustain appellant's position. He testified as follows:

"Q. Do you know why? Can you explain why you only included three [closets] on your worksheet? A. Well, that is so long ago I can't explain that, although lots of times they want some of them done in cedar, and that is the only answer I could give for it. Q. You don't remember at this time why? A. No."

Appellant claims that, at the meeting on August 14, 1946, it developed that, on the Plan 85 houses, a utility room was to be plastered, and that this was an entirely new requirement. Neither of the blueprints shows a utility room. Vitt testified that no utility room was called for. Studley's original work sheet, on the basis of which the original bid was submitted, shows no utility room, but one is included in the work sheet prepared on August 14th. The true explanation for the inclusion of a utility room on the second work sheet is revealed when the two work sheets are compared with Plan 85. The first work sheet, made in March, 1946, lists, among other items, a dining room 10′ x 10′, and a kitchen 8½′ x 15½′. The second work sheet, made on August 14th, lists no dining room, lists the kitchen as 10′ x 10′, and lists a "utility room" as 9′ x 15′. It therefore appears that, in the second work sheet, the dining room was erroneously designated as the kitchen, and the kitchen was listed as a utility room. The error, which was made by appellant, resulted in no increase in plastering yardage.

■ Since it is found that the plastering work required was contemplated by the original contract, the trial court was correct in finding that there was not a subsequent agreement, on August 14, 1946, which renders the original agreement unenforcible. In any event, such a subsequent agreement would be void because without consideration. *Queen City Const. Co. v. Seattle*, 3 Wn. (2d) 6, 99 P. (2d) 407; 12 Am. Jur. 985, Contracts, § 407; 3 Sutherland on Damages (4th ed.) 2654, § 707.

■ The evidence established that a serious shortage of rock lath used in plastering developed following the bid of

March 13, 1946. This shortage made it necessary to use wood lath, which was considerably more expensive to install. Appellant appears to contend that this increased expense justified refusal to perform the contract. The trial court·properly rejected this contention. Courts cannot set aside contracts because the performance of them becomes more difficult or more expensive than when they were entered into. *Brown v. Ehlinger,* 90 Wash. 585, 156 Pac. 544; *Harms, Inc. v. Meade,* 186 Wash. 287, 57 P. (2d) 1052; *Maryland Cas. Co. v. Seattle,* 9 Wn. (2d) 666, 116 P. (2d) 280.

It is our conclusion, on this branch of the case, that the trial court did not err in holding this to be a valid and enforcible contract.

Appellant's fourth, fifth and sixth assignments of error relate to the items of damage allowed by the trial court. It is first contended that no damages should have been awarded because respondent made a profit on the entire job. The estimates as to total profits range from fifteen thousand dollars to twenty-one thousand dollars.

▇ Where a contractor refuses to perform his contract, damages may be recovered for the difference between the contractor's bid and the actual cost to the owner of having the work performed by others. *Cahalan Inv. Co. v. Yakima Central Heating Co.,* 113 Wash. 70, 193 Pac. 210; 17 C. J. S. 1097, Contracts, § 512 (c). Likewise, interest on money borrowed by the owner to finance a construction project, accruing while the work is held up by a delay occasioned by the refusal of the contractor to perform, is a proper element of damage. *Peterman v. Goss,* 93 Wash. 184, 160 Pac. 432. In either case it is immaterial that the owner may have made a profit on the whole venture. *Speith v. Helm,* 301 Ky. 451, 192 S. W. (2d) 376.

One of the two items of damage allowed by the trial court was the sum of $1,983, representing the excess cost, over the Berg contract price, of having the plastering done by another contractor. Appellant asserts that this item of damage was largely mitigated, for the reason that the Federal hous-

ing administration raised the ceiling price on these houses because of such increased costs. The evidence indicates that, during 1946, these houses were subject to ceiling price regulations by FHA. On this particular project, Westland submitted cost estimates to FHA prior to any construction work, including an item of $440 for plastering each of the nine Plan 85 houses. FHA then set a ceiling price of $9,995 for each of these houses. When the Berg bid was received, indicating that the plastering would cost $505 for each of the houses, no request was made to FHA for a raise in the ceiling price. On September 18, 1946, however, after Berg had breached the contract and the plastering had been awarded to Steeves & Wilson for $686 per house, Westland filed an application with FHA to raise the ceiling price of the nine Plan 85 houses.

The application was accompanied by a revised cost analysis which listed increases in many items. The greatest single increase was that listed for the item of plastering, which was raised from the original estimate of $440, to $711, or $271. Westland sought a total ceiling price increase of $1,376.92 for each of the Plan 85 houses. FHA, on September 30, 1946, authorized an actual increase of $805 on each, raising the ceiling price from $9,995 to $10,800.

The record does not disclose how FHA arrived at this figure of $805. However, the figure amounts to fifty-eight and one-half per cent of the ceiling price increase requested by Westland. It is therefore fair to prorate the price increase among the individual items on the same percentage basis. Thus it may be assumed that FHA granted fifty-eight and one-half per cent of the $271 requested increase in plastering costs, or $158.53. An increase of sixty-five dollars on this plastering item (from $440 to $505) was justified because of the Berg bid. The excess over sixty-five dollars, or $93.53, therefore, may be said to represent the price increase approved by FHA to compensate for additional plastering costs above the Berg bid. On the nine houses this ceiling price increase attributable to increased plastering costs above the Berg bid thus aggregates $841.77. The average price at

which these nine houses actually sold substantially exceeded the new FHA ceiling price.

■■ It seems to us that this $841.77 increase in the FHA ceiling price, directly attributable to increased plastering costs above the Berg bid, is a proper deduction from respondent's claimed damages on this item. Had Berg performed the plastering contract at the bid price, Westland could not have obtained this ceiling price increase. In effect, what happened was that Westland obtained authority from FHA to pass along to the purchasers of individual houses, and did pass along to them, $841.77 of the plastering cost increase due to Berg's breach. In seeking and obtaining permission to minimize, in this way, the damages due to Berg's breach, Westland was performing the duty incumbent upon anyone who has suffered wrong at the hands of another to make a reasonable effort to mitigate his damages. *Peninsular Sav. & Loan Ass'n v. C. J. Breier Co.*, 137 Wash. 641, 243 Pac. 830; *Poston v. Western Dairy Products Co.*, 179 Wash. 73, 36 P. (2d) 65.

Having mitigated the damages to this extent in the manner indicated, Westland is not entitled to recover this amount a second time in this action against Berg.

The second item of damage allowed by the trial court was the sum of $2,604.41. This sum represents the court's finding as to interest on borrowed funds in connection with the project, accrued and paid during the period of delay in completing construction due to appellant's breach of contract.

Appellant does not deny that interest accruing while the work is held up by the delay of a contractor may be recovered as damages where a proper showing is made. It is contended, however, that here the evidence as to interest properly chargeable to appellant is too indefinite and incomplete to support an award, and that, in any event, the allowance on this item was excessive.

Respondent borrowed $65,500 from Carroll, Hillman & Hedlund to finance the project. The loan was prorated among the ten houses, $7,000 being charged against the

Plan 68 house, and $6,500 being charged against each of the nine Plan 85 houses. Mr. Hardesty, vice president of Carroll, Hillman & Hedlund, was called as a witness and identified and explained records from his office which showed the sums advanced on each house and the interest payments by months. Mr. Vitt, for respondent, testified that a computation of this interest from July, 1946, when it was asserted that plastering should have begun, until each house was substantially completed, totaled $2,606.41. In making this computation, Mr. Vitt stated that four weeks' interest was deducted to make allowance for the length of time it would have taken Berg to do the plastering. The court apparently accepted this figure, as it allowed $2,604.41 on this item, or two dollars less than Vitt's figure.

The interest figures submitted by Mr. Hardesty appear to be complete and reliable. The question, then, is whether appellant has been charged with more of this interest than is appropriate in compensating respondent for the delay due to breach of the plastering contract.

According to respondent's witness, Vitt, four or five houses were ready for plastering by June, 1946, but it was August 14, 1946, before all ten houses were ready. Most of the estimates submitted as to the time required to do the plastering were based upon the assumption that the crews would have all ten houses available at one time. We think appellant, in making its bid, could reasonably assume that it would not be called upon to proceed piecemeal with the plastering and could wait until all ten houses were ready. In any event, respondent apparently did not consider the contract breached until August 14, 1946, and accordingly that date should be accepted as marking the time when plastering should have begun.

■ Appellant, of course, should not be charged with interest during the period when it would have been doing the plastering, had the contract not been breached. In computing the length of time required, it is not possible to use as a guide the actual time consumed by the new plasterer, Steeves & Wilson, as there were special circumstances, re-

ferred to later, which unduly extended the actual time. Several estimates were submitted as to the length of time appellant would have needed, using a normal crew. Witnesses for respondent estimated this time at from three to six weeks. A witness for appellant estimated the time at from ten to twelve weeks. Accepting respondent's maximum figure, six weeks, it would appear that appellant should have completed the plastering by October 1, 1946. Interest chargeable to appellant should therefore begin as of that date.

After appellant refused to go forward with the contract, respondent took immediate steps to engage another plastering contractor. The construction industry was very active in the Seattle area at the time, and respondent had difficulty in finding any contractor who would take the job on short notice. Steeves & Wilson, who did the work, was actually the only contractor who would submit a bid. In making a bid this firm made it plain that the plastering of these ten houses would have to be accommodated to the company's prior commitments, which would undoubtedly result in considerable delay. This proved to be the case.

The plastering began in November, 1946. No testimony was given as to the exact date when the plastering in each house was completed. However, this can be determined with reasonable certainty by considering the testimony as to when construction of the houses was completed and how much time ensued between the plastering and the completion of the houses. The evidence shows when each house was ninety-nine per cent complete. It was undisputed that approximately four weeks' work was required to complete a house after the plastering was done. A date one month prior to the time when a house was ninety-nine per cent complete would accordingly be the approximate time when the plastering of such house had been completed. Since it is not contended that the delay adversely affected the marketability or market price of the house, appellant is not chargeable with interest beyond the time when plastering was actually completed.

The completion dates of the plastering, computed as indicated above, and the interest actually paid on the individual houses between October 1, 1946, and those dates, respectively, are as follows, each house being indicated by its street number on Fifty-eighth northeast:

| House | Completion Date | Interest |
|-------|-----------------|----------|
| 7008 | December 6, 1946 | $ 57.69 |
| 7014 | December 6, 1946 | 57.67 |
| 7024 | February 3, 1947 | 120.84 |
| 7038 | February 3, 1947 | 114.93 |
| 7316 | February 3, 1947 | 111.40 |
| 7002 | February 24, 1947 | 153.96 |
| 7030 | March 24, 1947 | 166.74 |
| 7322 | March 18, 1947 | 160.25 |
| 7332 | March 18, 1947 | 157.78 |
| 7342 | March 18, 1947 | 169.34 |

(In the case of No. 7030, the accrued interest has not been related to the date on which the house was ninety-nine per cent complete—August 7, 1947. Instead, we have used the completion date of March 24, 1947, stated in respondent's brief. The variance is probably due to the fact that the house, although only eighty per cent complete on March 24, 1947, was apparently then sold, thus terminating the interest chargeable to Berg.)

The total interest chargeable to appellant, based on the above computation, is $1,270.60. This is to be compared with the sum of $2,604.41 claimed by Vitt and allowed by the trial court. The difference between the two figures is accounted for by the fact that Vitt's computation of interest began with August 1, 1946, instead of October 1, 1946, and ended with the close of the loan on each house regardless of the time when the plastering was actually completed. Thus, under Vitt's computation, interest on 7030 Fifty-eighth northeast was allowed until March, 1948, notwithstanding the fact that the house was ninety-nine per cent complete on August 7, 1947, and was eighty per cent complete on March 24, 1947, on which date it was apparently sold and delivered to a purchaser who thereafter paid the interest. Likewise, on 7002 Fifty-eighth northeast, Vitt's method of computing interest charged appellant with interest to October, 1947,

although the house was ninety-nine per cent complete on March 24, 1947, and the plastering had been finished in February.

Appellant contends that it should not be charged interest during the protracted period during which Steeves & Wilson was plastering these houses. We would agree with this view if there was evidence that respondent was lax in obtaining completion of the plastering. However, the testimony indicates that respondent did everything possible to obtain early completion of the plastering after appellant's breach, and that Steeves & Wilson did the best it could in view of its prior commitments. Damages due to such delay were reasonably foreseeable and within the contemplation of the parties and hence recoverable under the familiar rule as to measure of damages established in the English case of *Hadley v. Baxendale,* 9 Exch. 341. See *Sedro Veneer Co. v. Kwapil,* 62 Wash. 385, 113 Pac. 1100; *Martinac v. Bakovic,* 158 Wash. 193, 290 Pac. 847; 15 Am. Jur., Damages, 451, § 52.

Appellant also contends that, in computing interest, consideration should have been given to the fact that respondent sold most of these houses and received earnest money payments before the plastering was completed. The earnest money payments ranged from five hundred to one thousand dollars on each house sold. We believe, however, that any benefit respondent received from these earnest money payments is more properly to be credited against respondent's personal investment in the project, over and above borrowed funds. The total cost of the project was $90,337, of which $65,500 was borrowed from Carroll, Hillman & Hedlund. The remaining $24,837 represented respondent's capital contribution, offset to some extent by the earnest money payments.

We conclude that an allowance of $1,270.60 for interest, incurred due to delays in construction caused by appellant's breach of contract, is supported by the evidence, and that a greater allowance on this item is not justified.

Appellant's last two assignments of error relate to the

failure of the trial court to give appellant a judgment for $145 on its cross-complaint covering expense of carting the lath (reduced to that figure from the $400 claimed in the cross-complaint); and failure to grant judgment dismissing respondent's complaint, or, in the alternative, a new trial. These assignments are necessarily disposed of adversely to appellant, in view of our conclusion sustaining the judgment for respondent, as herein modified.

 Turning now to respondent's cross-appeal, one of the two contentions made is that respondent should have been awarded damages for loss of interest on its own personal investment in the project, due to the delay occasioned by appellant's breach. Estimating an average six months' delay in completing each house, respondent contends that it is entitled to six per cent interest for that length of time on its asserted capital investment of twenty-six thousand dollars. The trial court disallowed this item, stating in its memorandum decision that the evidence is too uncertain and incomplete on this point.

We agree with the trial court that the evidence is inadequate to support respondent's claim on this item. Respondent did not bring in its own books and records. There is no way of ascertaining when respondent's investment was made and the amount outstanding during the period of delay. Moreover, its personal investment was minimized or reimbursed to a considerable extent by the earnest money payments received in connection with the sale of the houses.

Respondent also contends, on its cross-appeal, that the trial court erred in not awarding additional damages of at least three thousand dollars for increased general building costs, exclusive of plastering and interest costs, due to the delay in construction.

No attempt was made to establish, by its own books and records, the actual amount of increased costs experienced by respondent during the period of delay. Asserting that this would be impracticable, respondent sought to prove this item by submitting evidence as to a general twenty-five to thirty per cent rise in construction costs in the Seattle

area during that period. Based on testimony that about thirty per cent of the work on each house remained to be done after plastering was complete, and that seventy-five per cent of such costs were subject to the rising price spiral, respondent claims that $22,500 of the cost of the project was subjected to a twelve per cent average cost rise for an average six months period. This produces a figure of $2,690. Respondent asserts that this figure is too conservative for various reasons, and that a three thousand dollar award on this item would be just and reasonable.

The trial court disallowed this item, saying, in its memorandum opinion:

"While there is evidence herein that the costs of building construction continued to generally rise at approximately 2% each month subsequent to the execution of such contract, there is neither evidence nor an itemized statement in the record of the sums actually paid each month, during the delay, by the plaintiff, upon the cost of construction. A general profit and loss statement (Exhibit 13) fails to furnish an adequate basis for an accurate computation of such actual increased cost occasioned by such delay."

We agree with the trial court that respondent's evidence is too speculative and incomplete to establish its claim on this item.

The judgment is reduced from $4,587.41 to $2,411.83, and as so modified, is affirmed on the appeal and cross-appeal. Appellant will have its costs on this appeal.

SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.

SIMPSON, C. J. (dissenting)—It is my opinion the judgment of the trial court, based, as it was, upon the evidence submitted, was entirely correct. The judgment should therefore be affirmed.