[No. 25064. Department Two. September 20, 1934.]

CECIL POSTON, as *Administrator, et al., Respondents,*
v. WESTERN DAIRY PRODUCTS COMPANY,
*Appellant.*[1]

[1]Reported in 36 P. (2d) 65.

74

*Harroun, Malloy & Shidler* and *Warren W. Clarke,* for appellant.

*Graves, Kizer & Graves,* for respondents.

BLAKE, J.—Prior to October 18, 1929, plaintiffs owned and operated a dairy farm a few miles west of Spokane. They distributed their own product at the

doorstep in Spokane, for which purpose they owned and maintained all necessary equipment. They also manufactured cottage cheese. Over a period of years, they had built up a steady and consistent demand for their products, under the trade name of "Stadacona Dairy." They had two herds on their farm—one Guernsey, the other Holstein. Their milk trade consisted of two groups—one for Stadacona Guernsey, and the other Stadacona Holstein. Both brands were delivered in bottles.

For some time prior to the date mentioned, the defendant had been engaged on a large scale in distributing milk in Spokane. It was not a producer. On that date, plaintiffs and defendant entered into a contract whereby the defendant purchased, for six thousand dollars, the cheese vats, distributing equipment of plaintiffs, the trade name "Stadacona Dairy," and "all their [plaintiffs'] right, title and interest in and to their wholesale and retail milk sales and distribution of the business known as the 'Stadacona Dairy'." In other words, plaintiffs went out of the milk distributing business.

But the contract did not end with that. The plaintiffs were to continue to produce milk. It is with the provisions of the contract relating to the sale and distribution of plaintiffs' milk that we are particularly concerned. In substance, these provisions are as follows:

(a) Plaintiffs agreed to sell to defendant all "special bottled milk" produced by them, and deliver same in bottles at defendant's loading platform in Spokane. Plaintiffs also agreed to sell all milk produced by them, not to exceed 2,500 pounds per day, including the bottled milk.

(b) Defendant agreed to purchase from plaintiffs "all of their special bottled milk it can [could] sell at

fifteen cents per quart and pay . . . therefor the sum of eleven and one-half cents per quart.'' Such of plaintiffs' milk as could not be sold as special bottled milk was to be purchased by defendant at a price of fifteen cents per hundred pounds above the prevailing market price for ''bulk milk.''

(c) The contract further provided:

''This agreement shall remain in full force and effect for a period of one year from this date, and will be continued from year to year thereafter unless terminated by either party hereto giving the other party a ninety (90) days' notice in writing of their or its intention so to do.''

There was evidence to the effect that, when the contract was entered into, it was contemplated that there would be but one grade of Stadacona milk marketed. In other words, instead of selling Stadacona Guernsey and Stadacona Holstein, as plaintiffs had been doing, defendant proposed to combine the two as a special bottled milk under the Stadacona name. This was done until May, 1930, when it was found to be unfeasible, owing to the demand by old customers of plaintiffs for Stadacona Holstein. From that time until the events occurred which gave rise to this litigation, the milk was delivered by plaintiffs to defendant as Stadacona Guernsey and Stadacona Holstein, and by the defendant distributed as such, according to the demand of the trade. Such as could not be sold as bottled milk, the defendant purchased as ''bulk milk,'' in accordance with the provision of the contract above referred to.

In August, 1931, plaintiffs purchased the Waikiki Dairy. The product from this dairy was from a Jersey herd, and had been distributed for several years by defendant under a contract with the owner of the dairy, J. P. Graves. The contract between Mr. Graves and

defendant does not appear in evidence. It does appear, however, that the Waikiki product had been distributed in quart, pint and half-pint bottles, and that such as was not so distributed was purchased by defendant as bulk milk at three dollars per hundred pounds.

Before consummating the deal with Mr. Graves, plaintiffs discussed the matter with the manager of defendant. What transpired at that time, will be discussed in some detail later. What we are concerned with at present, is that, after this conversation, plaintiffs went through with the deal with Mr. Graves, and, until the events arose which gave rise to this litigation, marketed the Waikiki product through defendant in the same manner as they were marketing the Stadacona Guernsey and Stadacona Holstein, subject only to price fluctuations. The three grades of milk commanded different prices, except that, after plaintiffs took over Waikiki, defendant paid the same price for all bulk milk, Waikiki, Guernsey and Holstein alike.

It was not long after the contract of October 18, 1929, was entered into that the parties found that, owing to the unstable condition of the milk market in Spokane, it was not to the advantage of either to attempt to maintain the prices stipulated in the contract. The Stadacona and Waikiki were both quality raw milks, commanding a higher price than other milks distributed in the city. In order to maintain the market for them, it was necessary to lower the price relatively as the price of other milks fell. At the time plaintiffs took over Waikiki, defendant was paying Mr. Graves eleven and one-half cents. The price was reduced, however, to eleven cents a quart to plaintiffs. When the difficulty arose the early part of October, 1932, plaintiffs were receiving eleven cents a quart for Waikiki bottled milk, nine and one-half cents a quart

for Stadacona Guernsey, and seven cents a quart for Stadacona Holstein.

At this juncture, defendant initiated a campaign to sell a new brand of milk which it called "Hazelwood Gold Seal" milk. There was nothing in its contract with plaintiffs which prevented it from putting on the market and pushing the sale of any competitive milk, so long as it in good faith purchased from plaintiffs "all of their special bottled milk it can [could] sell." The gist of this action lies in the methods used by defendant in putting Hazelwood Gold Seal in competition with plaintiffs' milks.

Several weeks prior to October 5, 1932, defendant's officers conceived the plan of putting out a milk under a new brand. They employed an advertising agency to map out a campaign to introduce the new milk. Among the devices to attract attention was a metal cap for the bottles, for which a special kind of opener was provided. It was also necessary to procure a special machine from Los Angeles to cap the bottles with this metal cap. (This is important only in that it shows with what care and detail the plan of campaign was laid and carried out.) Drivers were called in and given a pep talk.

Of all these preparations, plaintiffs knew nothing. Defendant did not choose to exercise its right to terminate its contract with plaintiffs on ninety days notice. The first overt act apparently occurred on the morning of October 4th, at which time there appeared on the bottles left to users of Waikiki and Stadacona milk a pink placard, four inches wide and ten inches long, which was hung over the neck of the bottle, and bore the following inscription:

"Good Morning
*Save This*
You'll Need It
Details Tomorrow!"

*"This"* was a metal cap remover, which was attached to the placard with a rubber band.

The next morning, there was attached to the customers' bottles another placard, of the same size, but yellow. That was inscribed as follows:

"GOOD MORNING
See Tonight's CHRONICLE
For the Most Impor-
tant Announcement
Ever Made by Your
WESTERN DAIRY PRODUCTS COMPANY
After you've read this
Page of Good News
You'll Want to
DROP THIS TICKET INTO YOUR
MILK BOTTLE TOMORROW"

Below that was a detachable ticket, which contained the following:

"THIS TICKET dropped into your bottle *with your regular milk ticket,* authorizes us to start immediate delivery of that wonderful new GOLD SEAL product announced in the Chronicle. Leave this ticket! Our driver will call later to make adjustment for the slight difference in price.

"Name.............................................
"Address.........................................."

That evening (October 5th) there appeared nearly a full page advertisement, extolling the quality of Hazelwood Gold Seal milk, with a picture of the new metal cap. There is too much detail in the printed matter of the advertisement to quote extensively, but the following is a fair sample:·

"A richer, purer, better milk! A tighter, safer, 100% sanitary cap! Hazelwood is proud to bring you this truly ideal combination—this sealed-in purity—this extra assurance of QUALITY."

This advertisement was the first intimation plaintiffs had that anything threatened their economic exis-

tence. That night, however, they delivered on defendant's loading platform the usual amount of Stadacona and Waikiki bottled milk. Early the next morning, but after defendant's drivers had loaded and gone on their routes, one of the plaintiffs went to defendant's loading platform and found about half of the Waikiki and Stadacona milk, delivered the night before, still standing on the platform.

The facts, as we have so far related them, are practically undisputed. We come now to what the drivers did that morning and for two or three mornings following. The plaintiffs produced some ten or a dozen witnesses, users of Stadacona and Waikiki milk, who testified as to what the drivers did and said. These customers were from all parts of the city. The sum and substance of this testimony was that the drivers left Gold Seal milk for Stadacona and Waikiki customers, whether the customer had dropped the yellow ticket into the bottle or not; that this continued even after protest on the part of the customer; that, when the customer was pertinacious, there would be a follow-up call by a route captain or some higher dignitary of defendant's organization, with the purpose of persuading the customer to use Gold Seal milk. In some instances, the driver represented to the customer that plaintiffs were broke, in the hands of a receiver, going out of business, or that defendant could no longer procure plaintiffs' products.

To be sure, the drivers denied making such statements, and officers in charge of the selling campaign disclaimed inspiring them. Defendant asserts that these were isolated statements of its "menial servants," for which it was not responsible. Considering the widely scattered sections of the city from which the witnesses came, we think the jury was fully warranted in believing that such methods were generally used by

the drivers throughout the city to stimulate the sales of Gold Seal milk. Otherwise, what happened to plaintiffs' bottled milk business, would be inexplicable.

For some time prior to October 6th, defendant had been taking daily 144 quarts of Guernsey, 256 quarts of Holstein, 230 quarts and 220 half-pints of Waikiki. On October 6th, it took 84 quarts of Guernsey, 120 quarts of Holstein, and 130 quarts and 220 half-pints of Waikiki. Plaintiffs' revenues from the sale of milk were cut more than one-half in a single day. This continued until October 10th, when plaintiffs, claiming that defendant had breached its contract to purchase milk from them, terminated the contract. Thereupon, they set about building up a distributing organization of their own.

By December 31st, they had succeeded in restoring the revenues from milk sales to as high a level as obtained under the contract with defendant. They then brought this action for damages suffered because of defendant's alleged breach of the contract. The cause was tried to a jury, which returned a verdict in favor of plaintiffs for $2,250. From judgment entered on the verdict, defendant appeals.

Appellant makes forty-two assignments of error. It is not practical, nor is it necessary, to discuss these assignments singly and specifically. They form the basis of four main contentions, which are as follows: (1) That the evidence was insufficient to establish a breach of the contract; (2) that Stadacona Holstein bottled milk was not within the purview of the contract; (3) that Waikiki milk was not brought under the terms of the contract; (4) that the theory of damages upon which evidence was admitted, and which was submitted to the jury under the court's instructions, was erroneous. Other contentions are made which

are incident to those just mentioned. They will be noticed in the discussion of the principal contentions.

Appellant contends that there was no "anticipatory breach" of the contract. We agree to that. The breach was an intentional and substantial disregard by appellant of its own obligations and respondents' rights under the contract. The essence of the contract was not the purchase, on the one side, and the sale, on the other, of a few second-hand trucks and a couple of cheese vats. It was the sale of milk routes and a distributing organization. The appellant was a distributor, the respondents producers, of milk. It is inconceivable that respondents would sell their routes and distributing equipment and continue to produce milk without providing an outlet for their product.

Obviously, one of the principal objects of the provision requiring ninety days notice of intention to terminate the contract was to give respondents an opportunity to find or establish an outlet for their milk when appellant should cease to take it. This situation was adequately provided for in the portions of the contract to which we have alluded. Respondents agreed to sell all their special bottled milk to appellant. Appellant agreed to buy all of such milk that it could sell. Indeed, it did not agree to buy *all,* but that obligation was implied by law—at least to the extent that appellant would buy all which, in the exercise of reasonable diligence and ordinary good faith, it could sell. The obligation of the appellant to buy was reciprocal to the obligation of respondents to sell. 1 Page, Contracts (2d ed.), § 583; *Ehrenworth v. Stuhmer,* 229 N. Y. 210, 128 N. E. 108; *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381; *Lloyd v. American Can Co.,* 128 Wash. 298, 222 Pac. 876.

It will not do for appellant to say that it was still willing to buy all of respondents' milk that it could

sell, when at the moment it was using every means within its power to break down the market and demand for respondents' product. That the methods used by appellant in putting on the campaign to establish a market for its Gold Seal milk constituted a present substantial breach of its contract to purchase respondents' product, we are thoroughly convinced.

With respect to appellant's contention that Stadacona Holstein milk was not within the purview of the contract, we must again look to the situation of the parties at the time they entered into the contract, their purpose as may be gleaned from its contents, and their practice under it. As we have seen, respondents had an established market for two brands: Stadacona Guernsey and Stadacona Holstein. In the contract, the subject matter is referred to only as special bottled milk. For six months, all of respondents' milk—Guernsey and Holstein—was put out as a single product under the Stadacona label as special bottled milk. By the end of that period, the demand of the trade, which had been built up by respondents, for Stadacona Holstein had become so insistent that appellant reverted to respondents' method of marketing Stadacona products. This method was thereafter pursued without question being raised as to appellant's obligation under the contract to purchase from respondents their Holstein, as well as their Guernsey, milk. We think it is clear that the parties, when they entered into the contract, contemplated that the description, special bottled milk, should include the milk from both herds.

Appellant's contention that Waikiki's milk was not brought within the terms and operation of the contract is presented in a double aspect: (1) That the evidence was insufficient to make an issue for the jury on the question; (2) that the burden was upon respondents to prove ''by clear and convincing evidence''

that the Waikiki product was brought within the terms and operation of the contract. The court instructed the jury that the burden was on respondents to establish the fact by a preponderance of the evidence. Appellant's theory in this respect was that respondents were seeking to show a modification of the contract.

Of course, modification of a contract must be shown by clear and convincing evidence. *Dinsmore Sawmill Co. v. Falls City Lumber Co.,* 70 Wash. 42, 126 Pac. 72. But the issue presented here does not involve a modification of the contract. The question simply is whether a new and additional subject matter was brought within the terms and operation of the contract by the parties at the time respondents took over the Waikiki dairy. Again, we must revert to what was said and done by the parties at that time.

■ It will be recalled that, before taking over the Waikiki dairy, respondents advised appellant's manager of their intention so to do. They also advised the manager that they proposed to lease the Waikiki farm and move the Stadacona herds onto it. The manager told them, in effect, that it was not a wise move for them to make—that they could not afford to pay the rent reserved for the Waikiki farm. He also told them that appellant would not pay them the prices for milk that it had been paying to Mr. Graves. Nevertheless, respondents carried out their program.

There is no evidence of what Mr. Graves' contract with appellant was, other than that he was receiving eleven and one-half cents a quart for bottled milk and three dollars per hundred pounds for bulk milk. There is no intimation in the record that respondents, continuing delivery of the Waikiki product to appellant, were operating by virtue of any assignment—express or implied—on the Graves contract with appellant. On the other hand, all reasonable inference is to the

contrary, because the prices paid Mr. Graves were reduced to respondents to eleven cents for bottled milk and to the same price per hundred pounds for bulk milk as was provided in the contract for Stadacona bulk milk.

Either appellant was buying Waikiki milk from respondents day by day, when and as ordered and delivered, or it was purchasing it under the terms of the contract of October 18, 1929, subject to price adjustments. The first hypothesis is little short of preposterous. Appellant had an established trade for Waikiki milk that had been built up over a period of many years. The stability of the demand for the product is manifest in the tabulation of orders for Waikiki milk subsequent to October 5th. The only product that withstood the onslaught of appellant's campaign for Gold Seal was Waikiki in half-pint bottles. From first to last, the demand was constant—from 200 to 220 bottles a day. It is not conceivable that appellant ever contemplated that the supply for such a demand rested upon a day to day order, the fulfilling of which would be subject to the caprice of respondents.

We think that the evidence fully warranted submission to the jury of the question whether it was the intention and agreement of the parties to bring the Waikiki product within the terms and operation of the contract of October 18, 1929.

█ Appellant contends that the measure of damages applicable was the difference between the contract price and the market value of the milk. The difficulty with the application of the rule in the instant case is that there was no market for bottled milk of the Stadacona and Waikiki quality, except on the doorsteps of householders in Spokane. When, through the acts of appellant, respondents were deprived of that market, they faced the alternative of selling their product as

bulk milk or building up a distributing organization of their own. The former course spelled ruin, for, as bulk milk, their product would have returned little more than half of the daily cost of operating their dairy. They chose the latter alternative, with the result that, within ninety days, they had resuscitated their business to a volume equal to that just prior to the time appellant breached the contract. None the less, appellant contends that respondents, under the rule, were bound to sell their product as bulk milk and take their loss. We do not think the rule is so rigid as all that. After all, the underlying theory of damages is fair compensation for the injury—not protection for the one inflicting it.

It was the duty of respondents to minimize their damages. The only way they could do that and save their business was to recreate the doorstep market which appellant had destroyed. This, as we have seen, they did within ninety days—the period within which they would have had to accomplish that result had appellant exercised its right under the contract to terminate it on notice.

The case was tried and submitted to the jury upon the theory that respondents were entitled to recover the cost of setting up their distributing organization and loss of their milk sales up to the time that their volume of business and receipts was restored to the level at which it stood before the breach of the contract. We find no authority in the books for such measure of damages. Likewise, we find no case in the books like this. The measure of damages applied is, after all, only a modification of the rule contended for by appellant—the difference in market value and contract price.

The modification was admirably adapted to do justice between the parties in this case. It made the re-

spondents whole, and saved their business. At the same time, it worked no hardship on appellant. It conformed to the measure of damages defined in the Uniform Sales Act (Rem. Rev. Stat., § 5836-64 [P. C. § 6227-64], subd. 2), which provides: "The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract." Had the rule contended for by appellant been rigidly applied, the jury would have been warranted, under the evidence, in returning a larger verdict than it did.

■ Complaint is made that, in establishing their distributing organization, respondents put on the market a milk called Medo-Maid, as well as Stadacona and Waikiki. Medo-Maid was a cheaper milk. Respondents were not interested in creating a demand for it; but, finding a demand for a cheaper milk on the routes they were establishing for the sale of Stadacona and Waikiki, they supplied the demand, their object being to reduce the unit cost of distributing the quality milks. The actual increase in cost of distribution occasioned by marketing Medo-Maid was so slight as to render applicable the maxim, "The law will not take notice of trifling things."

■ Appellant complains that the court, in its instructions, injected several items of damage for which recovery should not be had on any theory. Dissected, sentence by sentence, one of the instructions may be susceptible to such criticism. When read as a whole, however, the instructions fairly submitted to the jury the theory of damages upon which the case was tried.

Many of the assignments of error are directed to rulings on the admissibility of the evidence. We think the evidence admitted over appellant's objection was competent and relevant to the issues as tried and as hereinbefore indicated.

A number of errors also were assigned to the refusal of the court to give instructions requested by appellant. The propriety of the court's refusal to give some of these instructions we think has been sufficiently indicated in what we have heretofore said. Other requested instructions were either covered by instructions given, or were irrelevant to the issues under the theory upon which the case was tried.

Judgment affirmed.

BEALS, C. J., TOLMAN, GERAGHTY, and HOLCOMB, JJ., concur.