[No. 29413. Department One. March 22, 1945.]

PAUL H. TONSETH *et al., Appellants,* v. CARL SERWOLD *et al., Respondents.*[1]

[1]Reported in 157 P. (2d) 333.

*Sam L. Levinson* and *Kathreen Mechem,* for appellants.

*Lycette, Diamond & Sylvester,* for respondents.

STEINERT, J.—Five members of a fishing crew, joining as plaintiffs, commenced this action against the operating owners of a fishing vessel to recover the balances of certain amounts alleged to be owing to the plaintiffs respectively as their shares of the net proceeds of a season's catch of tuna fish. The cause was tried to the court without a jury and resulted in a judgment dismissing the complaint with prejudice. The plaintiffs appealed.

At all times involved in this action, appellants, Paul H. Tonseth, Steen Alsos, Knut Skogen, Victor D. Neilsen, and Oscar Henslean, were fishermen and members of the Deep Sea Fishermen's Union of the Pacific, which, for brevity, will henceforth be designated simply as the union. Respondents, Carl Serwold (who will hereinafter be referred to as though he were the sole respondent) and Virginia Serwold, his wife, were the owners of a one-fourth interest in the motor vessel "Tordenskjold." The remaining three-fourths interest in the vessel was owned by respondent's mother and brother. Respondent was the master and managing operator of the vessel and, as such, was a member of the Fishing Vessel Owners' Association, Inc., hereinafter called the association.

On or about March 20, 1940, the association and the union entered into a written agreement making provision for the employment of crews of fishermen, the operations of the various vessels represented by their respective owners, and the basis upon which settlements should be made between the owners and their respective crews in the conduct of the various fishing enterprises.

The agreement contained, among other provisions, the following:

"1. All members of the crew, except the captain and any owner who owns one-fourth or over in his own vessel, shall be members of the Union in good standing. Cooks and engineers who are members in their respective maritime labor organizations shall also be under the jurisdiction of the

Union when they are employed on boats fishing for halibut, sable, ling and red cod, and *tuna.* . . .

"2.  The gross stock shall consist of all income of every kind from fishing operations and shall be distributed by deducting from it the following items in the order given: (a)  Gross stock expense, (b) *Boat share amounting to twenty per cent (20%) of balance remaining when gross stock expense is deducted from gross stock,* (c) Crew expense.  The amount remaining after these deductions have been made shall be divided equally among all members of the crew including the master, or in case a hole trip results, the deficit shall likewise be divided and be paid according to paragraph 17 [which last-mentioned paragraph is not material here.]  . . .

"15.  The crew shall not be charged for any item not mentioned in this agreement until the item has been approved by the Union.

"16.  Settlement shall be made and shares distributed when a trip is ended or when any fisherman quits.  . . .

"18.  Notice shall be given at time of settlement when a captain decides to discharge any member of the crew or any member of the crew decides to leave.  . . .

"23.  *All provisions in this agreement, in so far as they are applicable, shall apply to halibut vessels fishing tuna out of Washington and Oregon.  Owners of vessels changing from halibut to tuna fishing shall put on tuna equipment.* . . .

"25.  . . .  Any dispute between the captain or owner and crew which cannot be settled on board shall be referred to the Association and Union for adjustment immediately upon arrival in first port where the Association and Union have offices.

"26.  This agreement shall remain in effect from date until cancelled by thirty days' written notice by either party."  (Italics ours.)

It is undisputed that for two years prior to the 1942 fishing season, respondent and his various crews had operated under that agreement without any difficulty and, further, that ever since 1930 until after the controversy in this case had culminated, the owners of the "Tordenskjold" were members of the vessel owners' association.  The record does not disclose the terms of the various agreements existing between the association and the union during

those former years, but presumably they were similar to those of the 1940 agreement. In this connection, it should be stated that, during all the years prior to 1942, respondent's operations were limited to halibut fishing and occasional shark fishing, except that in 1939 he also engaged in tuna fishing according to the method of tuna fishing then in vogue. Shark fishing ventures are governed by a different form of agreement between the owners and their crews. At the conclusion of the halibut season in October, 1941, respondent and his crew engaged in shark fishing lasting until March, 1942. Since then, respondent has limited his operations to tuna fishing.

As will appear later, the controversy in this case presents a dispute between the litigants as to the right of the respondent to deduct from the gross income of the operations of the vessel during the 1942 fishing season, or otherwise to charge against the proceeds of such operations, for the "boat share," an amount greater than, or additional to, the twenty per cent deduction provided in paragraph 2, subdivision (b) of the agreement as set forth above.

Prior to the 1941 fishing season, the standard method of fishing for tuna in Washington and Oregon waters was by trolling. In changing from halibut to tuna fishing as conducted at that time, additional equipment would be required, involving an expense of not more than thirty to fifty dollars. During that same season and for years prior thereto, the standard method of tuna fishing in California waters was the so-called "bait method." This method requires equipment wholly different from, and much more expensive than, that used in the trolling method. In about 1941, also, California vessels, following the run of tuna into northern waters, made their appearance off the coasts of Oregon and Washington, and the difference in methods of fishing for tuna was thereby more noticeably brought to the attention of local vessel owners and their crews.

In this state, it is the custom for fishing-vessel owners to hire their crews in the spring of the year, some time before the actual fishing season begins, and in the interim between the time of hiring and the commencement of the

fishing expeditions the crew so selected is required to work upon and about the boat, putting the gear on board and otherwise caring for the vessel. For this work, which may extend over a considerable period of time, the members of the crew receive no extra pay, since the work is considered a part of the season's operations for which they are compensated on the basis of the amount of fish caught.

The season for tuna fishing ordinarily begins about July and ends in October or November. The shark fishing season begins in the late fall and extends into the following spring. The operations during the various seasons are conducted in successive trips, and at the end of each trip, after the fish which have been caught on that trip are unloaded and sold, the proceeds therefrom are distributed according to the agreement existing between the vessel owner and the crew. In the case at bar eight trips, in all, were made by the respondent during the 1942 season, and all of these were devoted entirely to tuna fishing.

In 1941 and prior years, respondent and his various crews had followed the practice above described, pursuant to the 1940 agreement, or agreements similar thereto, and no controversies had arisen between them. Several of the appellants herein had been members of the crew of the "Tordenskjold" for five or six years.

Down to this point there is no dispute between the parties as to the factual situation. From here on, however, there is a wide divergence in the contentions of the litigants, particularly with reference to their agreement, or rather their understanding, as to the amount that was to be deducted by the respondent from the "gross stock," or income, and credited as the "boat share" during the 1942 season.

In the spring of 1942, respondent decided to limit the operations of the "Tordenskjold" to tuna fishing and to use the "bait method" instead of the "trolling method." For that purpose, it was necessary to install upon the vessel a quantity of special equipment consisting of a three-thousand-gallon bait tank, a bait seine, two water pumps and an engine, pipes and fittings, a power skiff, poles, squids, racks,

lines, hooks, and other mechanical apparatus. The total cost of this equipment amounted to more than three thousand dollars, which respondent paid. A part of this work was done in Seattle, but the tank was installed in Astoria, Oregon, just before the commencement of the tuna fishing operations. The five appellants herein, and one other individual, had previously been engaged by respondent to compose the crew for the 1942 season, and most of them had worked upon the boat during that spring, according to the usual custom.

It may be well to state here that respondent's theory of the case is that the 1940 agreement, though still in existence in 1942 so far as halibut fishing and the trolling method of tuna fishing are concerned, has no application whatever to tuna fishing by the bait method; that in the season of 1942 he was engaged, and his crew was employed, solely in tuna fishing by the latter method; and that it was definitely understood and agreed between himself and the crew that he was to deduct for the boat share of the operations an amount, as hereinafter set forth, greater than that prescribed in the 1940 agreement. Appellants contend that, despite the altercations that subsequently arose with reference to that subject, they never agreed to any rate of compensation to themselves other than that provided in the agreement of 1940. We may also say that the appellants Neilsen and Henslean were not present, in person, at the trial, and that whenever we make reference herein to the testimony of the appellants we are referring to that of the appellants Tonseth, Alsos, and Skogen.

At the conclusion of all the evidence in the case, the trial judge rendered an oral decision in which he stated that he was satisfied that the evidence preponderated in favor of respondent's contention that "before they went out he [respondent] said he was going to demand the taking out of the net [proceeds] $33\frac{1}{3}$ per cent." If that statement had reference to the time the vessel left Seattle, rather than to the time it left Astoria on the first fishing trip, the statement is not supported by the evidence, for, on direct examination, respondent testified:

"Q. Did you have any discussion or say anything about —I mean prior to the time that you went to Astoria relative to what would be your boat's share or what you would or would not fish for? A. I couldn't say that. I knew myself that I would not fish down there with a bait tank for 20 per cent, and I am confident that all my crew knew it. One of the witnesses here just stated— MR. LEVINSON: Just state what you told them about it. I object to this relating the testimony. THE COURT: Just state what conversation you had. A. Well, we talked about going tuna fishing with a live bait tank, and I don't remember specifically saying that I was going to charge 30 per cent or 40 per cent or 20 per cent even on tuna. I did not mention what I was going to charge. I stated I was not going fishing for 20 per cent, and my crew knew I wasn't, although it has been said here that— Q. Don't state anything that was said here. A. We merely didn't talk about that, because I would not fish for 20 per cent. I don't recall that I told them how much or said anything covering specific percentages that I know of. I don't even remember saying 33 per cent before I left Seattle—that is what you refer to? Q. Yes, I am speaking of before you left Seattle. A. No. Q. What portion for the boat's share did you figure? A. Thirty-three and a third per cent. Q. That is at the time that you went away for tuna? A. Right."

The disputed question in this case is whether at any time, or upon any occasion, after the vessel had arrived at Astoria, Oregon, the parties here concerned reached and acted upon a definite agreement or understanding that respondent was to retain from the gross income of the respective fishing trips a "boat share" in excess of twenty per cent of the balance remaining after gross stock expense had been deducted from the gross income.

Respondent testified that at the end of the first fishing trip, on August 1, 1942, and on the day the first load of tuna, amounting to about ten thousand pounds, was delivered to the cannery at Astoria, the members of the crew, all being present, asked him what the vessel's share would be, and that he then told them that the venture was a new kind of fishing, for which the Astoria and California boats took from thirty to forty-five per cent for the boat share. We quote his further testimony as set forth in his brief:

"So one of the crew, Steen [Alsos] I think that it was, said, 'You can take 35 per cent off.' And I said, 'No, I wont do that. I will charge 33⅓, take the ice and oil off the gross and take 33⅓ per cent.' They told me O. K., fine, and I settled the trip that way, and that was the end of the settlement. And I made two more trips and they settled each trip that way. They got paid in full, and each trip I took 33⅓ per cent for the boat's share. . . ."

It further appears, from respondent's testimony, that after he had sold the first load of fish to the cannery, he had the bookkeeper of the cannery company prepare a statement for use by the respondent in making a settlement with the appellants. This statement showed the total amount received for the fish, the amount of gross expense, the boat share of the proceeds on the expressed basis of 33⅓ per cent, the amount of crew expense, and the amount to be paid to each of the crew, including a like amount for the respondent as master. Checks in the sum of $142 each were issued and handed to the appellants, respectively. Respondent testified that the prepared statement and all the bills were shown to the appellants, and he now contends that these payments constituted settlement in full for the first trip.

Appellants testified that, although on several occasions respondent had stated to them informally that the California boats were charging for their boat share various amounts in excess of twenty per cent, the appellants never agreed, nor expressed themselves as agreeing, that respondent might reserve thirty-five per cent, or any other amount in excess of twenty per cent, for the boat share. They further testified that they never saw the written statement referred to above, that it was never discussed between them and the respondent, and that the checks were issued to, and received by, them simply as payment on account, pending final settlement at the end of the season, as had always been customary with reference to respondent and his crew in former years. There was no testimony that when respondent handed the checks to the appellants he advised them that full payment for their shares of the proceeds was thereby intended.

The second fishing trip ended on August 13, 1942, and the third on August 21st of the same year. Similar payments, or settlements, were made on those occasions, under the same respective terms and conditions as those obtaining on the first occasion, whatever such may be held to have been.

At the end of the third trip, the "Tordenskjold" was tied up at Astoria for about a week, and in the interim respondent and some of the men went to their homes in Seattle. On their return, respondent found that all of the fishing vessels, including not only the Seattle fleet, but also the California and Oregon fleets, were tied up. This situation concededly was the result of a general dispute concerning the amounts that the Seattle vessels should be allowed to charge for "boat share," and the percentages of proceeds to be paid to the fishing crews.

A meeting of the various vessel owners was called and held at Astoria. Fifteen or sixteen of such owners from Seattle, including the respondent, attended the meeting. The record discloses that the owners could not agree among themselves as to the effect of the 1940 agreement fixing the boat charge at twenty per cent or as to what should be done in view of the difference between the charges made by Seattle boats and those made by the California and Oregon vessels. It further appears that in that meeting of the vessel owners respondent declared that he would not fish for twenty per cent. The meeting adjourned without any action being taken.

Shortly thereafter, the situation, so far as it related to the respondent and the appellants, reached its climax. Respondent, according to his testimony, called the crew together and advised them that on future trips, beginning with the fourth one of the season, he would make a charge of "20% and one share for the boat." His testimony on that subject, as quoted in respondent's brief, is as follows:

"A. I went to the boat where the crew was and said, 'If you want to do any fishing, there are lots of boats laying around,' and I told the men, *'I will charge 20 per cent and one share.'* That is what I told them in that meeting, I said,

'That is what I will charge.'  The men were going to quit, some did and others didn't.  The fish were a little slack right at first, but then a couple of small boats came in with quite a bit of fish and they got excited and wanted to go fishing.  So I just stuck to it, *20 per cent and one share,* said 'that is just what I am going to charge.'  Q. Did you give the crew any alternative?  A. I told them if they did not want to fish for that they could quit the boat.  Q. What did your crew do as far as fishing is concerned?  A. They went fishing," (Italics ours.)

and, further:

"So we were going to take *20 per cent and one share,* and the fellows didn't want to settle up for that and I said, 'That is the way I am going to settle.'  And they said, 'Let us leave and go fishing,' Ted Trudel said then, 'We can go fishing and settle up at the end of the season,' and I said, 'That is all right.'  I said, 'I don't like to do that, I like to make a settlement at the end of the trip, but if that is the way you folks want it I will go.'  So they went fishing on that condition, but I told the crew, 'I don't care whether you figure it at the end of each trip or the end of the season, that is the way I settle, *20 per cent and one share.'*  So that was understood perfectly.  And several times other than that—I believe three or four times when the boat was lying there, several times all of the crew were going to pack their sacks and quit,  .  .  ."  (Italics ours.)

By the expression "20 per cent and one share," as used in respondent's testimony, he meant twenty per cent as provided in the 1940 agreement *plus* one share of the net proceeds equivalent to the share to be received by each of the appellants. This extra share for the boat was to be in addition to the share which, according to the 1940 agreement, respondent was to receive as a member of the crew.

It will be observed that this later demand by the respondent was different from the earlier one for a straight $33\frac{1}{3}$ per cent.  It may be stated, also, that the later demand resulted, by subsequent computation, in a charge of 31 per cent instead of $33\frac{1}{3}$ per cent.

As indicated in the testimony of the respondent, above quoted, the position taken by him on that occasion gave rise to a prolonged and heated dispute.  The appellants

testified at length with reference to that situation and denied positively that they ever acceded to either of respondent's demands, but insisted that the terms of the 1940 agreement were controlling. They further testified that they resumed work upon the understanding and agreement between themselves and the respondent that their compensation for the remaining trips, of which there were five, should cumulate until the end of the season, at which time the matter was to be submitted to the union for settlement, as was provided in the 1940 agreement.

At the end of the season, respondent made final payments to the appellants upon the basis of what he testified was the understanding and agreement at the end of the third trip, following the tie-up of the fleet of vessels, that is, a boat charge of "20% and one share." In doing so, however, respondent readjusted, or, as he testified, "resettled" the amounts earned by, and paid to, the appellants on the first three trips, resulting in their receiving additional compensation for those trips. It is not asserted that these final payments were accepted by appellants as final settlement. Sometime later, appellants commenced this action seeking to recover the balances claimed to be owing to them, amounting to eighteen hundred dollars.

Our statement of the case has been extremely long, but we have thought it necessary to go to this length in order clearly to present the issues here involved.

█ The written agreement of 1940, referred to above, constituted what is known as a collective labor agreement. It was, in itself, a bargaining agreement entered into by and between the association and the union. Although by its mere execution that agreement acquired no legal force and exerted no legal effect with reference to the parties to this action, it would, however, become legally enforcible as to such parties if they should specifically accept it, or contract with specific reference to it, or if the evidence should show that the parties intended to include it, by implication, in a contract of employment made directly between themselves. *Clark v. Claremont Apartment Hotel Co.*, 19 Wn. (2d) 115, 141 P. (2d) 403; 31 Am. Jur. 872, Labor, § 97.

From what has already been stated herein, it is clear that, to the extent of its applicable provisions and terms, the 1940 agreement became a part of the 1942 contracts of employment, whether written or oral, between the respondent and the members of his crew, including the appellants.

One of the respondent's contentions which should be considered at this point is that the 1940 agreement can have no application to this case, for the reason that by paragraph numbered 23 thereof, as quoted above, its provisions, in the event of a change in the character of fishing, apply only where the change is from halibut fishing direct to tuna fishing; whereas, in the case at bar, respondent says, a season of shark fishing intervened between the halibut season of 1941 and the tuna operations of 1942.

We are not impressed with that argument. It is clear from the record that there was no interruption in the continuity of the employment relationship between the parties throughout the entire period covering the operations of both 1941 and 1942. The shark season always fell between the end of one halibut season and the beginning of either another halibut season or a tuna season. It was customary for the vessel owners to engage in shark fishing during the proper season, although under a separate contract, and then resume either halibut fishing or tuna fishing at the beginning of their next regular season. If respondent's contention were correct, then the 1940 agreement would not apply even when the vessel owner engaged in halibut fishing in two successive seasons, but, in the interim between those two seasons, also engaged in shark fishing. We interpret paragraph 23 of the agreement to mean, as its language fairly indicates, that when a vessel formerly used for halibut fishing is later, in the same season or in the beginning of the next season, used for tuna fishing, the agreement retains its existence and original force, unless it is expressly modified or terminated, and that, so long as the agreement remains in effect, the owner of the vessel is required to supply it with tuna equipment at his own expense, and not

charge that expense either directly or indirectly to the crew.

■ If respondent, in the 1942 season, had continued in the usual way of fishing for tuna by the trolling method, we would have no doubt whatever that the 1940 agreement would control the hiring and employment of the appellants and the terms of their compensation. In fact, had that been the situation, this controversy would in all probability never have arisen. Respondent contends, however, that changing the method of fishing for tuna, with its consequent change of equipment, produced an entirely different situation and rendered the 1940 agreement inapplicable.

An examination of the 1940 agreement as quoted above discloses frequent references to tuna fishing generally, without regard to any particular method of conducting that operation. It specifically provides that, in changing from halibut fishing to tuna fishing, the owner of the vessel shall put on tuna equipment. Necessarily, the choice of both the kind and the method of fishing lay with the vessel owner. He could pursue the occupation of tuna fishing either by the trolling method, as respondent had done in the past, or change to the bait method, as he contemplated doing in the future. The members of the crew had nothing to say upon that question, except to decide, each for himself, whether he would, in the beginning of the season, enter into a contract of employment with the respondent to engage in tuna fishing or in any other kind of fishing, by any contemplated method whatever. When they did enter into such contracts of employment, however, both parties were governed by the terms of the 1940 agreement, in the absence of any agreement of modification as to any of its particular terms.

Respondent employed the appellants for the 1942 season, obviously for the purpose of conducting a tuna fishing venture. He permitted, or required, them to work upon the vessel during the outfitting period preceding the actual fishing operations. For this work, the men received no compensation, but were bound to look to the proceeds of the subsequent expeditions. As respondent himself admitted

in his testimony, he did not inform the appellants, at the time of their employment for the season or while they were engaged in the preliminary work of getting the boat ready, that he intended to reserve for the boat share any specific percentage or any percentage radically different from what had previously obtained.

It will also be noted that the additional equipment which respondent installed upon the vessel was in the nature of a capital investment, and neither under the terms of the 1940 agreement nor by any legal principle or business practice could such equipment be charged to the fishermen. If, because of such increased capital investment, respondent desired or intended to exact a higher boat charge, it was his duty to make some definite arrangement therefor as between himself and the appellants, or else hire another crew with whom he could come to some satisfactory agreement with reference to such charge. Since he failed to do that, we are of the opinion that appellants' contracts of employment were on the basis of the terms of the 1940 agreement.

Respondent's chief reliance is based upon the result of the turn of events which took place after the vessel had arrived, or while it was stationed, at Astoria, from which the fishing excursions were made. In that respect, he first contends that at the end of the initial fishing trip it was definitely understood and agreed between him and the appellants that he was to charge a boat share of *thirty-three and a third per cent*. Appellants contend that no such agreement was made.

It is true that the trial court made a finding in favor of the respondent upon that issue. However, it is patent from the trial court's oral decision, which appears in the record, that the court proceeded upon the theory that the burden of proof lay upon the appellants. While, concededly, the appellants were required to assume the burden of proving their case, they met that burden initially by establishing, as we now hold, that their contracts of employment included within their terms the provisions of the 1940 agreement, and the amounts due them under that agreement. The

burden then shifted to the respondent to show, by clear and convincing evidence, that the original agreement had been modified by subsequent agreement. *Dinsmore Sawmill Co. v. Falls City Lumber Co.*, 70 Wash. 42, 126 Pac. 72; *Armstrong v. Wheeler*, 86 Wash. 251, 150 Pac. 5; *Poston v. Western Dairy Products Co.*, 179 Wash. 73, 36 P. (2d) 65; *Schulz v. Spokane United Railways et al.*, 16 Wn. (2d) 43, 132 P. (2d) 366.

We do not think the respondent has met that burden. After a careful reading of the statement of facts, we can well agree with the introductory statement made by the trial court in its oral decision rendered ·immediately upon the conclusion of the trial: "Gentlemen, the testimony in this case is not very clear." While the *testimony* itself is, in some respects, not altogether clear, we do have the written agreement of 1940, which is very clear and supports the contentions of the appellants.

In this connection, respondent further contends that the issuance by him, and the acceptance by the appellants, of the ·checks at the end of the first three fishing trips constituted a complete settlement. Again, the evidence upon that question is in serious conflict. Respondent contended upon the trial that the checks, based upon the statement prepared by the cannery company's bookkeeper, were given in full settlement of the amounts owing to the appellants. On the other hand, appellants not only claimed that they had never seen the written statement, but also contended that the checks were given and accepted on account, pending a final settlement at the end of the season.

�they The doctrine of accord and satisfaction was discussed at length in *Graham v. New York Life Ins. Co.*, 182 Wash. 612, 47 P. (2d) 1029, where the various rules upon the subject were stated and the supporting decisions cited.

Two of the rules there stated read as follows:

"To create an accord and satisfaction in law, there must be a meeting of minds of the parties upon the subject and an intention on the part of both to make such an agreement. [Citing cases.]"

"Where the amount of a debt or obligation is unliquidated or in dispute, then the tender by the debtor of a certain sum in full payment of the debt, followed by acceptance and retention of the amount tendered, establishes an accord and satisfaction; but if the amount be liquidated or undisputed, then such tender and acceptance do not establish an accord and satisfaction. [Citing cases.]"

█ While, in the case at bar, there was a dispute, the dispute was solely with reference to the basis upon which the amount of appellants' compensation should be paid. There was no dispute as to the correct amount, once the basis of computation was determined. If the written agreement controlled, then the amount due thereunder was fixed and certain. Likewise, if that agreement had been modified by a subsequent agreement, as respondent contends, then the amount due thereunder was equally certain. Since we hold that the written agreement prevails, the claim was liquidated, and, consequently, the payment of a lesser amount did not constitute an accord and satisfaction.

█ Finally, respondent relies upon the circumstances created by the tie-up of the entire Seattle fleet in the latter part of August, 1942, culminating in the alleged alternative which he gave the appellants of either quitting the boat or else acceding to his demand for "20% and one share" as the boat share of the proceeds, and in the alleged acquiescence in that demand by the appellants. We have already called attention to the difference between this later demand and the earlier demand by the respondent for a straight 33⅓ per cent of the proceeds.

The issue arising out of that situation is likewise attended with conflicting contentions. Respondent contends that since he gave the appellants the option of accepting his terms or else quitting the boat, and since the appellants did not quit the boat but continued to work thereon as before, therefore they must be held to have agreed to his terms, and hence a new agreement was made, or the old one modified. Appellants contend that they refused the offer, insisted upon the terms of the original agreement, and

remained at work upon the understanding with the respondent that the entire matter should be submitted to the union at the end of the season. Upon that issue, we think the burden was upon the respondent to show by clear and convincing evidence that the former written agreement was modified. We are of the further opinion that respondent has not met that burden.

The original agreement provided by its terms not only that any dispute between the owner and the crew which could not be settled on board should be referred to the association and the union for "adjustment," but also that the agreement should remain in effect from its date until canceled by thirty days' written notice by either party. Concededly, neither of these required steps was taken by respondent, although appellants were insisting upon their observance, at least upon the first of those provisions.

It is noteworthy that no payments or settlements were made at the end of any one of the last five trips, but full and complete settlement was left to the end of the season. This, in our opinion, corroborates the contention of the appellants, for there would have been no point to their waiting for the shares due them at the end of each of the five trips unless something remained for adjustment and settlement at the end of the season.

We conclude this opinion by stating that our view of the matter is that the 1940 agreement became binding and enforcible through its acceptance by both parties; that appellants made their case by establishing the existence and effect of that agreement; that by its terms respondent was required to install, at his own expense, the equipment for tuna fishing by the bait method, without deduction for any part of the cost thereof, directly or indirectly, from the gross income; that the burden of proving a modification of the written agreement was upon the respondent; that respondent has not met that burden by clear and convincing evidence; and that appellants are entitled to recover, on the basis of the terms of the original agreement.

The judgment is reversed, with direction to the trial

court to enter in its place a judgment in accordance with the views herein expressed.

BEALS, C. J., MILLARD, JEFFERS, and GRADY, JJ., concur.

